Henry B. **FOLDEN** and Jean Folden, husband and wife, dba Crestwood Convalescent Center, et al., Plaintiffs,

v.

**WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, et al., Defendants.**

No. C87–802TB.

United States District Court, W.D. Washington, at Tacoma.

April 5, 1990.

Thomas H. Grimm, John F. Sullivan and James R. Watt, Inslee, Best, Doezie & Ryder, P.S., Bellevue, Wash., for plaintiffs.

Charles F. Murphy and Susan Lomax, Office of the Atty. Gen., Olympia, Wash., Mark Lynch, Robert M. Thomas, Jr. and Steven G. Bradbury, Covington & Burling, Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRYAN, District Judge.

THIS MATTER came before the Court for trial commencing September 25, 1989. On September 26, October 16 and October 20, 1989, the Court rendered oral rulings, which have been transcribed and filed and are incorporated herein as Findings of Fact and Conclusions of Law by this reference. On the basis of the testimony presented at trial, the documentary evidence admitted, and the trial briefs and oral argument from the parties, and its oral rulings, the Court now enters the following additional findings of fact and conclusions of law. If anything herein is inconsistent with the above-referenced oral rulings of the court, said oral rulings shall control.

## FINDINGS OF FACT

### I. INTRODUCTION

1. This action was brought by 14 corporations, partnerships and individuals that have contracted with the Washington Department of Social and Health Services (DSHS or the "Department") to provide nursing home care to Medicaid patients during all or part of the period from July 1, 1981, to the present.

2. The plaintiffs' principal federal law claim is that the Medicaid reimbursement rates paid by DSHS under state statutes and the Washington Plans for Medical Assistance (the "State Plans") in effect since July 1, 1981, have not been "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards," as required by 42 U.S.C. § 1396a(a)(13)(A) (the "Boren Amendment"). The plaintiffs identify several subissues of both federal and state law related to this principal claim. These subissues involve challenges to particular aspects of the State's Medicaid reimbursement system. In addition, the plaintiffs claim that the assurances given by DSHS to the Health Care Financing Administration (HCFA) to gain federal approval for the State Plans did not comply with HCFA's regulations implementing the Boren Amendment and were not supported by adequate findings as required by 42 C.F.R. § 447.253.

3. The plaintiffs also have raised several claims that are not related to the Boren Amendment: 1) The plaintiffs claim that the State's statute and regulations implementing the federal Deficit Reduction Act of 1984 (DEFRA) violate the equal protection clause of the Fourteenth Amendment by treating providers who purchased their facilities on or after July 18, 1984, differently from those who purchased before that date. 2) The plaintiffs claim that the defendants have violated their authority under state law to amend the regulations that govern scope of audit procedures. 3) They claim that DSHS's implementation of the temporary "wage enhancement cost center" rate violated state law. 4) They claim that the defendants have exceeded their statutory authority by adopting and applying limits on new construction costs recognized for reimbursement. 5) Finally, the plaintiffs claim that DSHS's choice for the index of allowable nursing services cost increases recognized for rate-setting violates state law.

4. On the defendants' motion this action was removed from state court. In the interests of a full resolution of the issues before this Court, the defendants voluntarily waived in writing their Eleventh Amendment immunity in the present suit.

5. On February 19, 1988, the Court certified a class of plaintiffs in this action pursuant to Fed.R.Civ.P. 23(b)(3), described as:

> All Skilled Nursing Facilities and Intermediate Care Facilities located in the State of Washington licensed by the Washington State Department of Social and Health Services and which have contracted with the Department to provide medical services to needy persons pursuant to Title XIX (Medicaid) program during the period from July 1, 1981, through the present.

6. There are approximately 275 private nursing homes currently operating in the State of Washington that participate in the Medicaid program, of which 23 have opted out of the class. In addition, there are a number of plaintiffs in the class who are former owners of nursing homes that have been closed or sold.

7. The Medicaid program is federally created and regulated pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* The purpose of the program is to provide medical assistance to low income persons. The financing and administration of the Medicaid program are a cooperative effort between the federal and state governments. In Washington State, the federal share of Medicaid payments is approximately 53% and the State's share is approximately 47%. The State's program is administered by DSHS.

## II. WASHINGTON'S REIMBURSEMENT SYSTEM

8. During the period covered by this lawsuit, DSHS has purchased nursing home care for Medicaid patients through a system of cost reimbursement set forth in RCW Chapter 74.46 (RCW Chapter 74.09 prior to July 1, 1983), WAC Chapter 388–96, and the State Plans. The WAC regulations implement the statute, and the State Plans describe the reimbursement system established by the statute. RCW Chapter 74.46 is quite detailed in setting forth the mechanism for calculating the Medicaid reimbursement rates and leaves little discretion to DSHS. To a large extent, therefore, the reimbursement system in Washington has been fashioned by the Legislature rather than the Department.

9. DSHS enters into a contract with each provider. (Exs. 112 & 113.) The State's contractual obligations are co-extensive with applicable law.

### A. *Overview of the System*

10. DSHS reimburses each provider's Medicaid costs through the payment of a per-patient-day (PPD) reimbursement rate for each of the provider's Medicaid patients. The reimbursement system is specific to each provider and involves two steps: rate-setting and settlement.

11. An annual interim PPD rate is set prospectively for each provider by DSHS for the period July 1 through June 30 (the "rate year"). The interim rate is based on

the provider's allowable costs for the prior calendar year (the "cost year") as reported in the provider's annual cost report, adjusted for inflation. Under the state statute, each nursing home provider must submit a cost report by March 31 of the year following the cost year. RCW 74.46.040. The cost report, which requires a great deal of very detailed information, serves two functions. It provides the data for setting the interim PPD rate for the coming rate year that begins July 1, and it provides the initial data for settlement of final reimbursement for Medicaid costs incurred by the provider during the cost year covered by the report.

12. In the rate-setting process, the interim PPD rate is based on four cost centers—nursing services, administration and operations (A & O), food, and property—and also contains a fifth component, return on investment (ROI). The ROI component became effective on January 1, 1985, and replaced a return on equity (ROE) component. In addition, for the period January 1, 1988, through June 30, 1990, the rate contains a sixth component, the wage enhancement cost center, which was created by the Legislature to bring all nursing home employees up to a minimum wage level.

13. The interim rate is established by rate analysts who perform a "desk review" of the provider's cost report. The desk review basically involves four steps. The rate analyst first determines whether the reported costs are "allowable," as prescribed in RCW 74.46.190 through .410 and corresponding regulations, and whether they are reported in conformance with DSHS's technical reporting requirements. Second, the analyst compares the provider's costs to the costs of the rest of the nursing homes in the State to flag unusually high costs. If the reported cost for a particular expense line item substantially deviates from the industry average for that item, the analyst may request additional information from the provider and may disallow the excess cost. Third, the analyst applies various lids and limitations, prescribed by statute, to the costs reported in certain cost centers. These lids and limitations are discussed in more detail below.

Finally, after computing the costs on which the prospective interim rate will be based (the "rate base"), the analyst applies to certain cost centers an inflation adjustment factor (IAF), approved by the Legislature, in order to arrive at the rate that will become effective July 1. (Testimony of Denise S. Gaither.)

14. In the settlement process, the provider's final reimbursement rate is fixed for a prior cost year. Since interim rates cover the period between July 1 and June 30, each cost year is governed by two different interim rates, which are weighted and averaged for the cost year. As required by RCW 74.46.150(1), the final rate is the lower of the interim rates paid to the provider during the prior cost year or the audited allowable costs actually incurred by the provider during that year. Currently, about two-thirds of providers are audited before final settlement. For those not audited, their reported costs (subject to desk review but not subject to lids) become their audited allowable costs for settlement purposes.

15. Providers whose costs in the prior cost year were less than their interim rate (in the four cost centers, not including ROI) must refund the excess reimbursement. However, the statute provides in the settlement process for "shifting," which allows the provider to shift a surplus in the rate in some cost centers to a cost center where the rate is less than cost. If, after shifting, the provider still has excess rate in A & O or property, he may retain "cost savings" of between 50 and 75% of the surplus rate in those cost centers. The provider retains the full ROI rate. (Testimony of Denise Gaither.)

16. The "cost savings" feature of the settlement process creates an incentive for providers to contain their costs in the A & O and property cost centers. The State does not allow retention of cost savings in the nursing services and food areas in order to encourage providers to expend fully the funds allocated to those areas, which are the cost centers with the greatest impact on patient well-being. The purpose of encouraging full spending in the nursing

services and food areas is to foster higher quality care.

17. At every significant point during the rate-setting and settlement processes—the initial rate setting, the preliminary settlement, the audit (if one is conducted), and the final settlement—providers have an opportunity to appeal the determinations made by DSHS staff. At each of these points, providers may first seek an informal appeal to DSHS staff supervisors. Providers may then pursue a formal appeal through the administrative hearing process and finally in state court. (Testimony of Denise Gaither.)

## B. Cost Containment

18. The Medicaid program pays for approximately 67% of all nursing home patient days in Washington State. This percentage is comparable to, although slightly higher than, that seen in other states participating in the Medicaid program. Thus, the Medicaid program is the principal payer for nursing home care in the United States.

19. Most states use prospective rate-setting systems which have the effect of helping to control inflation and contain costs. Retrospective cost systems, on the other hand, pay rates equal to the ordinary expenses actually incurred by nursing homes (regardless of whether those expenses are necessary or efficient) and are therefore less effective in controlling the increasing costs of Medicaid care. (Testimony of William Scanlon.)

20. Washington uses a prospective system that establishes rates on an annual basis—where a provider's actual allowable costs from the previous cost year are the basis for the provider's next interim rate. This process is termed "rebasing." Annual rebasing helps rates to reasonably reflect trends and shifts in the types and methods of care provided and in the cost of such care. In practice there is an 18–month lag between the time the base year costs are incurred and the interim rate based on those costs is paid. An inflation adjustment factor partially covers the cost increases expected during the 18–month lag period.

## C. The Rate Components

21. As noted above, rates are composed of several components. Much of the controversy in this case focused on aspects of the specific components, and therefore it is appropriate to describe each one.

### 1. The Nursing Services Cost Center

22. The nursing services cost center contains the salaries, benefits and payroll taxes paid for all nursing staff. There are two lids applied to the nursing services cost center in the desk review process—a lid on the number of hours of nursing care reimbursed, and a lid on the rate of increase of nursing costs. If both lids are applicable to a particular provider's costs, DSHS applies only the one having the greater impact. RCW 74.46.481(6) & (7). (Testimony of Denise Gaither.)

23. The nursing hours lid is designed to remove from the rate base costs paid by a provider for hours of nursing care that are unreasonably excessive in light of the relative debility of the patients served by the provider. Using an index of patient debility developed by the Battelle Institute in the 1970s, DSHS ranks each Medicaid patient in a nursing home at least annually according to the patient's functional level and need for services, and computes an average Battelle score for the provider. Using average Battelle scores and reported direct care nursing hours for all providers in the State, DSHS then calculates a predicted level of direct care staffing for each Battelle score. This calculation is updated every two years. Providers are lidded if their direct care staffing exceeds the predicted level plus 1.75 standard statistical deviations. (Testimony of Elizabeth H. Johnston and Denise Gaither.)

24. Because 1.75 standard deviations provide a wide allowance, the nursing hours lid affects very few providers—only about five percent of Medicaid nursing homes in the State. In the July 1989 rate-setting, this lid affected ten providers, and in both the 1988 and 1987 rate-setting it affected 14 providers. (Testimony of Denise Gaither.) As one of the plaintiffs' own witnesses testified, any provider whose

nursing hours exceed the predicted level for its Battelle score by more than 1.75 standard deviations is "definitely," "almost categorically" inefficient. (Testimony of Cheryl Hill, CPA, at 35.)

25. Although the Battelle index does not take account of every factor or change in nursing care that may affect the level of care provided to individual patients (testimony of Elizabeth Johnston), it is still as accurate a measure of the relative debility of patients as any other measure available. (Testimony of William Scanlon.) Moreover, the fact that the State updates the calculation of average Battelle scores and predicted levels of staffing every two years means that the nursing hours lid will reasonably reflect current practices in the Washington nursing home industry. DSHS's use of the Battelle score is innovative in comparison to other states' Medicaid plans. It is rare for states to devote such effort to collect data on individual patients' debilities and to calibrate a payment lid to match each provider's circumstances. (Testimony of William Scanlon.)

26. The second lid in the nursing services cost center is a limit on the rate of increase in costs that the State recognizes for rate-setting. If the provider has reported a rate of increase in nursing costs over the previous two calendar years that is greater than the rate of increase over the same period in the medical care component of the Consumer Price Index (MC–CPI), the nursing cost increase that the State recognizes for purposes of setting the interim rate for the next rate year is limited to the rate of increase in the index. Pursuant to RCW 74.46.481(5), DSHS is required to use the MC–CPI in applying the nursing services cost increase lid unless DSHS determines that another index is more representative of nursing cost increases.

27. The MC–CPI is an index of prices paid for health services, including physicians, hospitals, dentists and drugs.

28. In the last three years, nursing home providers in Washington have experienced a sharp increase in nursing services costs. As a result, a larger number of providers (from 56 in 1987 to 118 in 1989) have been affected by the nursing services cost increase lid. (*See* Ex. A–578.) The reasons for this increase in nursing costs are unclear. The evidence indicates that part of the increase may be due to changes in the availability of nurses, to a rise in the quality and quantity of care required and given in nursing homes, the need for more highly trained nurses, and to a trend toward an older patient population and patients who are sicker and are released from hospitals earlier than in previous years. (Testimony of Elizabeth Johnston, Cheryl Hill and Charles Hawley.)

29. DSHS closely monitors the impact of the nursing services cost increase lid.

30. Increases in the total reimbursement that DSHS has paid for nursing services costs can be partially explained by "rebasing." Because of rebasing, the impact of the cost increase lid on particular providers is likely to be short term. The lid applies only to the rate of increase in costs from year to year; it is not a lid on how high nursing costs can go. An increase not allowed one year may still be incorporated into the provider's rate the following year due to rebasing, because once the provider's rate of increase in nursing services costs stabilizes, the higher costs will be fully reimbursed. The decision by the State not to reimburse rapidly increasing nursing costs in the current rate year is an attempt to contain costs prospectively. (Testimony of William Scanlon.)

31. Other provisions in the Washington reimbursement system also explain why, despite the cost increase lid, total reimbursement for nursing services has increased at a faster rate than the MC–CPI. Under the "current funding" provisions of the system, providers may request a prospective rate increase to cover the costs of additional staff or new nursing programs required by DSHS (wage increases for existing staff levels are not so provided). Pursuant to an amendment enacted in 1987, DSHS must respond to current funding requests within 60 days. RCW 74.46.-481(10). Current funding increases are also granted for some costs not included in

the nursing services area, such as the costs of capital improvements required by DSHS. Additionally, when new providers enter the system, they are given interim rates on the basis of budgets of their projected costs rather than on the basis of cost reports, since they will not have incurred Medicaid costs in the prior year. New providers' projected costs are not subject to the cost increase lid, and therefore new provider budgets are another factor in higher nursing reimbursement. (Testimony of Denise Gaither.)

32. As noted above, the State's Medicaid statute directs the Department to "select" a relevant index of nursing cost increases and, "[i]n the absence of a more representative index," to use the MC–CPI. RCW 74.46.481(5). The Department has interpreted this statute to require it to select the most representative *existing* index rather than to develop the Department's own index. Beginning in at least 1984, the Department from time to time has investigated the possibility of using other indexes for the nursing cost lid. (Testimony of Denise Gaither.)

33. Most recently, in the spring of 1988, a member of the Department staff did an extensive search for a more representative index. As part of this investigation, he solicited suggestions from the nursing home industry. The only index located through this effort that was arguably more representative than the MC–CPI was an index devised by HCFA. This index, however, would result in lidding more costs than does the MC–CPI and was opposed by the industry. Consequently, the Department withdrew its plan to begin using the new and more restrictive index at least for the 1989 cost year. (Testimony of Paul Montgomery).

34. In addition to the regular nursing services cost center rate, DSHS grants some "exceptional care" rates for providers who treat patients with extremely heavy care needs. Exceptional care rates boost the nursing services reimbursement for such providers. There are currently about 50 (of 22,000) patients in the State that are included in the exceptional care category. (Testimony of Denise Gaither.)

### 2. *The Administration and Operations Cost Center*

35. The A & O cost center encompasses a variety of operating and administrative costs incurred by providers, including wages, benefits and payroll taxes for the administrators, bookkeepers, accountants, attorneys, laundry staff, housekeeping staff, dietary staff and maintenance staff. Also included are utility costs, property taxes and nursing supplies. There is a lid applied in the A & O cost center based on the 85th percentile of A & O costs in all nursing homes. Providers with A & O costs per day in excess of the 85th percentile level have the 85th percentile level substituted for their actual costs in setting the next interim rate. The lid is recalculated each year based on the most recent cost reports. (Testimony of Denise Gaither.)

36. There are additional limitations in the A & O cost center regarding the amount of allowable salaries for administrative personnel and the amount of management fees allowed. As of July 1, 1989, there is also a limitation on accounting and legal expenses. Providers are free to exceed these limits, and some owners of nursing homes choose to pay themselves and others management fees or salaries as administrators that are in excess of the limits. Since DSHS does not reimburse excess administrative compensation or payments, such payments affect the facility's income and cash flow. (Testimony of Denise Gaither.)

### 3. *The Food Cost Center*

37. The food cost center includes costs of all raw food and beverages. The food rate is a flat rate for all providers. It is based on the average January 1, 1983, rate, inflated forward at each rate-setting by the inflation adjustment factor approved by the Legislature. As of 1986, 193 providers out of approximately 275 received a food rate that exceeded their food costs. (Testimony of Denise Gaither.)

### 4. *The Property Cost Center*

38. The property cost center has changed during the period covered by this

lawsuit. From before July 1, 1981, until January 1, 1985, the property cost center rate included payment for depreciation, interest costs for those providers who were paying a mortgage on their facilities, and lease costs for those providers who were leasing their facilities. Interest and lease costs were generally considered allowable unless they were between related parties or, for interest costs, were at rates far in excess of going interest rates. If a loan or a lease was between related parties, only the underlying cost to the related party was considered for reimbursement. There also were specified minimum depreciable lives for assets. Prior to 1985, DSHS lidded property costs at 1.75 standard deviations above the predicted level of property costs for all facilities of similar age, construction type and location. If a nursing home was sold, DSHS recognized a new depreciation base, interest or lease expense (unless the sale was between related parties). (Testimony of Denise Gaither.)

39. Beginning on January 1, 1985, the property cost center was changed to reimburse only depreciation, using the same minimum depreciable lives as before 1985. Depreciation is reimbursed according to a straight-line method, unrelated to any actual cash expenditures by a provider for improvements to the facility or its equipment, and is controlled by RCW 74.46.360. The property rate is an unrestricted amount of reimbursement that the provider can use for any purpose. (Testimony of Denise Gaither.)

40. The payment that the State makes for depreciation expense is a potential source of profit to the providers. For the nursing home business, depreciation is not an out-of-pocket expenditure, it is rather an allocation over time of the book value of the business's physical assets. In real terms, the nursing home assets for most providers in Washington State are appreciating over time, not depreciating. The nursing home industry in the State has realized a substantial aggregate gain on sale of assets during the period covered by this lawsuit. (*See* Ex. A–600.) The State makes no attempt to recapture the depreciation reimbursement paid to providers

when they sell their nursing homes for a gain. (Testimony of William Scanlon.) Owners of a nursing home may claim income tax deductions for depreciation expense on the nursing home's assets and thus realize a double benefit from depreciation—Medicaid reimbursement plus a tax deduction. (Testimony of Wallace Walsh.) (*See* Ex. A–589.)

### 5. *The ROE/ROI Rate*

41. The ROE rate, which was in effect from before July 1, 1981, through December 31, 1984, was calculated as a percentage of the provider's equity at the end of the cost year. This percentage was equal to the percentage paid for ROE under the Medicare program. ROE was a profit opportunity for providers and was an incentive to invest in the nursing home. Only for-profit providers received ROE. (Testimony of Denise Gaither.)

42. The ROI rate, which became effective January 1, 1985 (at the same time the State changed the property cost center), has three components: a financing allowance, a working capital allowance, and a variable return allowance. The financing allowance is 11% of the facility's net book value of assets used in patient care and is paid over a 30–year period in lieu of direct reimbursement of capital interest or lease expenses. All providers receive a financing allowance whether or not they incur any actual interest or lease expenses. The working capital allowance is 11% of 5% of operating costs. The financing allowance and working capital allowance are not restricted to the payment of any particular expenses. Providers may have excess in the financing allowance if they obtain interest rates less than 11%, finance less than the entire purchase price of the facility, or negotiate lease agreements that keep their costs below 11% of the net book value of the assets. They can use that excess for any purpose, whether to cover other costs or as profit. (Testimony of Denise Gaither.)

43. The variable return allowance is a percentage increase that is added on to the rates paid for nursing services, A & O,

food and property. The percentage increase ranges from one to four percent, depending on how low the provider's A & O and property costs are in relation to all the other providers in the State. This allowance is an incentive for providers to be efficient and economically operated because it rewards lower cost providers. The larger increases paid to lower cost nursing homes provide more assurance that these homes will have sufficient revenue to incur additional necessary costs. The lower increases given to higher cost homes put some pressure on them to control their rate of cost increase or to lower their costs. The variable return allowance also provides another opportunity for a profit. (Testimony of William Scanlon.)

### 6. The Wage Enhancement Cost Center

44. In 1987, the Legislature enacted a special temporary cost center, called the wage enhancement cost center, to provide funds to enable providers to comply with legislation applying minimum wage requirements to nursing home employees. In the fall of 1987, the Department instructed the industry on how to report wage costs so this increase could be implemented. However, the information submitted by the providers was unsatisfactory to the Department, and the Department set the enhancement rate on the basis of information submitted in the 1986 cost reports. At the time the Department issued these enhancement rates, it also advised the providers that if they submitted the required information, the Department would adjust the enhancement rate accordingly. Approximately 200 providers appealed, provided the proper information, and received the supplemental wage allowances. Approximately 78 did not pursue this opportunity and therefore got the allowance on the basis of their 1986 costs. (Testimony of Paul Montgomery.)

45. No evidence was presented that the enhancement for the 200 providers that did appeal was improperly calculated. Nor was any evidence presented that the 78 providers that did not appeal were denied notice of the opportunity to appeal or otherwise were treated unfairly. There was no evidence that any of those that did not appeal had any right to a wage enhancement in addition to what the Department gave them on the basis of the 1986 cost reports.

### D. The Audit Process

46. In the audit process, DSHS auditors receive copies of the cost reports submitted by providers. The audit staff work with desk review staff to determine which cost reports will be audited each year. Each provider must be subjected to audit at least once every three years. In conducting the audit, DSHS auditors establish a "scope of review" for each nursing home cost report to be audited, choosing only certain cost areas to review.

47. The audit process focuses on whether providers have adequate records to document certain reported costs in those particular cost areas within the scope of review. As a practical matter, DSHS auditors cannot conduct a thorough and meticulous audit of every cost item reported by providers. (Testimony of Sandra Libbey.) Therefore, the audit process cannot pinpoint all unnecessary costs. The auditors are not able to determine whether each care-related expense must be incurred in order to provide care that conforms with licensing and certification standards. (Testimony of William Scanlon.) It was clear from the testimony that the audit process does not, as plaintiffs alleged, eliminate all unallowable costs.

48. In May 1989, DSHS changed the scope of audit regulations to require that the auditors apply the rate-setting lids in the audit process beginning with audits of the 1987 cost year. Prior to May 1989, the auditors applied only the limitations which could be determined by review of an individual provider's cost report and supporting documentation. It was not DSHS practice to apply the statutory lids in the audit process before May 1989 because final settlement is calculated at the lower of audited cost or interim rate and the interim rate already incorporated application of the lids. (Testimony of Denise Gaither.)

### E. *The Inflation Adjustment Factor and the Budget Process*

49. The inflation adjustment factor (IAF) that DSHS adds on to providers' rate bases to arrive at their interim rates is prescribed by the Legislature in its biennial Budget Act. The source of the IAF is the "implicit price deflator" that is established by the State's Economic and Revenue Forecast Council, a bipartisan council of state legislators and officials of the executive branch.

50. The implicit price deflator that the Forecast Council sets is a forecast of the expected increase over the following year in the U.S. Commerce Department's implicit price deflator of goods and services, which is a general index of inflation experienced in the national economy. The State uses the federal index to predict expected future inflation because there is no comparable index that is specific to the Washington economy.

51. The implicit price deflator forecast is calculated by the Council's staff solely on the basis of inflationary trends identified in the federal index. The Forecast Council does not adjust the implicit price deflator on the basis of available revenues or the State's budgetary needs. The Legislature does not make adjustments to the implicit price deflator when prescribing the IAF for purposes of nursing home rate-setting. (Testimony of Chang Mook Sohn, Ph.D.)

52. The budget for DSHS's Medicaid program for nursing homes is supervised by the Office of Financial Management (OFM) within the Governor's office, and is approved by the Legislature every two years in the biennial Budget Act. In overseeing the biennial budgets, OFM allows for three separate increases in funds appropriated for the nursing home program: an increase for the projected effects of rebasing; an increase for "rate creep," which includes expected higher reimbursement rates attributed to new provider budgets and to DSHS's approval of requests for current funding; and an increase for a general inflation adjustment. (Testimony of David A. Black.)

53. OFM generally relies on the expertise of DSHS staff in determining prospective increases attributable to rebasing and rate creep. The inflation adjustment factor that OFM adds into each biennial budget is equal to the most recent implicit price deflator forecasted by the Economic and Revenue Forecast Council. This is the same IAF used by DSHS in rate-setting as prescribed separately by the Legislature.

54. In making its inflation adjustments to the nursing home budget, OFM does not alter or reduce the implicit price deflator increase or the increases allowed for rebasing and rate creep on the basis of revenues available to the State or the State's budgetary needs. OFM treats the nursing home budget as an entitlement program whose payment requirements must be fully funded.

55. If the amount of appropriation provided in a biennial budget falls short of DSHS's Medicaid payment needs for nursing homes, DSHS requests a supplemental budget appropriation. OFM and the Legislature regularly approve supplemental budget requests because of the entitlement nature of the nursing home program. The Legislature invariably appropriates the money necessary to pay the rates prescribed by the statutory rate-setting mechanism. (Testimony of David Black, Paul R. Lamm and Donald A. Gary.)

56. OFM does not affect DSHS's rate-setting process through the biennial budget. The budget and rate-setting processes are separate. (Testimony of David Black, Paul Lamm and Don Gary.)

57. The testimony from state officials regarding the biennial budget process and the role of OFM and OFM's application of the IAF was consistent and credible and was uncontested.

### III. ADEQUACY OF THE RATES

#### A. *Introduction*

58. This case is about money and not about quality of care. From the evidence, it is clear that, generally, nursing home patients in the State of Washington are receiving good care. The State monitors

the quality of care and has ample weapons to enforce compliance with care quality standards. Providers who do not provide adequate care may lose their license to operate a nursing home.

59. The plaintiffs assert that they provide high quality of care, but that doing so under the rates paid by the State is causing them financial hardship. No evidence substantiated the claim that nursing homes in this State, generally, are suffering financial hardship. The rates paid under RCW 74.46 are adequate to enable efficient and economic facilities to provide the standard of care required by state and federal law.

### B. *The "Lag"*

60. As a practical necessity, the method used by DSHS for annually rebasing a provider's interim rates creates a "lag" period between the cost year and the rate year at each rate-setting. The provider experiences inflation during this lag period which is not fully reflected in the costs incurred by the provider during the prior cost year, and thus will not be fully reflected in the provider's prospective rate base without some additional adjustment. This inflation lag may be measured from the middle of the cost year to the middle of the rate year, a period of 18 months. (Testimony of Daniel Humphrey, Steven D. Huebner, CPA, Lowell W. Bassett, Ph.D., and William Scanlon.) During this 18-month time frame between the midpoint of the cost year and the midpoint of the rate year, providers experience cost increases due to general inflation in the economy and cost increases due to a rise in the costs of inputs that are specific to the nursing home industry, such as nurses' wages. (Testimony of Daniel Humphrey, Lowell Bassett and William Scanlon.)

61. The Washington reimbursement system attempts to compensate for this inflation lag in a number of ways. First, DSHS adds the IAF percentage adjustment to the provider's rate base in setting the interim rate. As noted above, the IAF is based on a forecast of inflation expected in the general economy over the following year. Further, DSHS pays the provider an ROI rate that contains the variable return allowance, which is an unrestricted percentage increase given as a bonus for cost containment. For providers who earn the higher variable return allowances of three or four percent, these two upward adjustments in the rate—IAF and variable return—substantially cover the cost increases experienced in the nursing home industry during the 18-month lag, as measured by the HCFA Market Basket Index. This fact is illustrated by Exhibit A-581 prepared by the defendants' expert witness, Dr. William J. Scanlon. (*See* Ex. A-581.) (Testimony of William Scanlon.)

62. When the IAF and variable return allowance adjustments are analyzed in combination with the rebasing process, the effect of the lag is virtually eliminated over time. (*See* Ex. A-582.) Dr. Scanlon's Exhibit A-582 sets out a running comparison of rates to costs using the HCFA Market Basket Index as a hypothetical index of cost increases. Exhibit A-582 shows that since 1985 the IAF and a variable return allowance of three percent, combined with annual rebasing, have resulted in rates at the midpoint of each rate year that closely track costs incurred at the same point in time. Providers who earn a four percent variable return would receive higher rates in relation to costs, and the percentage of rate increase would be even greater if current funding increases were included in the analysis. (Testimony of William Scanlon.)

63. Over the period covered by this lawsuit, the actual rates paid by DSHS—including all components of the rate—have fairly compensated for the average cost increases experienced by the nursing home industry as reflected in the best available index of inflation for nursing homes, the HCFA Market Basket Index. From 1981 through 1988, the State's total average reimbursement rate has increased almost 70%, or nearly eight percent annually. In comparison, the Market Basket Index over the same period has increased a total of 39%, or under five percent annually. (Ex. A-580.) (Testimony of William Scanlon.)

64. The HCFA Market Basket Index is the best available inflation index because it

measures actual increases in the cost of inputs used in the nursing home industry. It is a national composite index made up of indices that are drawn from sample data in different geographical areas, including most large metropolitan statistical areas like the Seattle area, as well as smaller statistical areas. There is no regional equivalent of the Market Basket Index. There are some factors related to cost increases—such as changes in case mix—that are not reflected in the Market Basket Index, but there is no available index that can capture these cost increases, short of the providers' actual cost experience. Actual cost experience is not an accurate and useful index of necessary inflation. (Testimony of William Scanlon.)

### C. *Reimbursement Ratios*

65. The parties prepared several statistical exhibits regarding the adequacy of DSHS's overall reimbursement of providers' costs. Defendants' Exhibits A–595 and A–596 indicate that the State's Medicaid rates reimbursed between 98.5% and 101.7% of the plaintiffs' aggregate costs during the years covered by this lawsuit. On the rate side, these exhibits include all components of the reimbursement rate except the financing allowance and working capital allowance portions of the ROI rate, which are excluded because of the lack of complete reporting by providers of interest and lease expenses incurred after 1985. On the cost side, Exhibits A–595 and A–596 exclude interest and lease costs after 1985 and the depreciation expenses reported by the providers (since depreciation is not a true out-of-pocket cost, as discussed above). These exhibits also deduct from the providers' costs those amounts that exceed the lids used in the various cost centers.

66. These exhibits indicate substantial levels of reimbursement of the providers' aggregate costs. A comparison of total rates to total costs would have been a more accurate indicator of the adequacy of the State's reimbursement than the partial rates and costs provided to the Court. However, the Court recognizes that a complete comparison is difficult, if not impossible, due to the lack of data on providers' interest and lease costs.

67. Exhibits A–595 and A–596 are also significant in detailing the amount of reimbursement provided in particular components of the rate payment.

68. Exhibit A–583, prepared under the direction of the defendants' expert Dr. Scanlon, provides a comparison of costs per day and reimbursement rates paid by DSHS for all nursing homes in the State, arrayed into quartiles according to the level of their costs. These tables show the percentage of nursing homes in each quartile that have received various ratios of reimbursement, ranging from 93% to 99% of their audited costs. Again, the reimbursement rate included in this exhibit is the total rate paid by DSHS except for the financing allowance and the working capital allowance after 1984. The costs include all audited costs except interest and lease expenses after 1984. No amounts were removed for costs in excess of lids. A second version of these tables was also introduced which removed depreciation expense from the cost side of the comparison.

69. Exhibit A–583 shows that substantial percentages of providers received near full reimbursement in all years, especially in the quartiles of lower cost providers. For example, between 81.9% and 91.7% of providers in the lowest cost quartile have had 95% or more of their costs reimbursed from 1982 to 1988. (Ex. A–583.) It is also significant that a substantial (though steadily diminishing) percentage of homes in the higher cost quartiles have also received near full reimbursement. Between 12.5% and 63.4% of homes in the highest cost quartile have had 95% or more of their costs reimbursed. (Ex. A–583.)

70. Exhibit A–584 is a series of histogram charts for the years 1982 to 1988 that depict the percentages of reimbursement paid to all providers in the State. The data in Exhibit A–584 corresponds to the information contained in the tables in Exhibit A–583. The histogram charts graphically portray the ratios of reimbursement experienced by all providers throughout the in-

dustry. They show that a number of providers every year receive reimbursement for greater than 100% of their costs, and a number receive less than 100% of their costs. (Ex. A–584.) (Testimony of William Scanlon.)

71. The plaintiffs' expert Mr. Humphrey introduced an exhibit indicating that from 63% to 91% of providers in the years 1981 through 1988 had less than 100% of their costs reimbursed by DSHS, counting only the rates paid in the four cost centers and not counting the ROE/ROI rate. (Ex. 7.) Because the Court found that a comparison of costs to less than the full rate payment was not helpful in determining the adequacy of the State's rates, Mr. Humphrey reworked one of his exhibits to allow an offset from a portion of the providers' ROE payments and "cost savings" against the reimbursement shortfall in the four cost centers. The reworked exhibit indicated that between 47% and 74% of providers with final settlements did not receive 100% reimbursement in the years 1981 to 1984. (Ex. 120.) Mr. Humphrey made no attempt to indicate what percentage of providers received near full reimbursement—such as reimbursement ratios of 97%, 95% or 93%. Mr. Humphrey's exhibits assumed that all allowable costs reported by the providers and accepted by DSHS on audit were the necessary costs of efficient and economical facilities. Under his analysis, even providers who were reimbursed all but one dollar of their costs would appear to be "underfunded." (Testimony of Daniel Humphrey.)

72. During his rebuttal testimony, Mr. Humphrey introduced an exhibit that reformulated most of the assumptions contained in defendants' Exhibit A–596. (See Ex. 130.) Exhibit 130 simply showed the number of providers receiving less than 100% reimbursement of costs. Like Mr. Humphrey's earlier exhibits, Exhibit 130 did not include all relevant information.

D. *Financial Ratios*

73. The plaintiffs also presented evidence through Mr. Humphrey and Steven D. Huebner, CPA, regarding an alleged decline in the general financial health of the State's nursing home industry during the relevant period. This evidence consisted of aggregated financial ratios for all providers drawn from Mr. Humphrey's database of cost report information. (Ex. 92 & Ex. 126.) The information contained in these ratios was incomplete and inaccurate. Mr. Humphrey and Mr. Huebner compared only ratios for 1981 and 1987, whereas similar calculations for the other years involved in this lawsuit may have produced ratios substantially different. (*See* Ex. A–599.)

74. Furthermore, the ratios calculated by the plaintiffs' experts were susceptible of distortion by the financial manipulations that some providers engage in—such as related-party lease arrangements and other excess unallowable expenses—that directly benefit the owners of a facility while burdening the facility's bottom line and weakening its financial health. If those providers had chosen not to incur these unallowable expenses, their net income would be increased or net losses decreased. If they had spent the money on allowable activities, their Medicaid revenues would have been increased, which would have improved their bottom lines and hence their financial ratios. (Testimony of Denise Gaither.) The total effect of such manipulations is unknown.

IV. CREDIBILITY OF THE EXPERTS

75. This case necessarily involves an analysis of statistics and the adequacy of rates to costs. Since the Court is not an expert in health care economics or statistics, the Court must rely to an extent on the credible testimony of the parties' experts in these areas.

76. The testimony of the defendants' expert witness, William J. Scanlon, Ph.D., of the Center for Health Policy Studies in Washington, D.C., was credible and reasonable. Dr. Scanlon is impartial and professional. He has previously worked as a consultant for both state governments and private Medicaid providers. He has never testified as an expert witness at trial before the present case. Dr. Scanlon demon-

strated substantial experience with and understanding of Medicaid reimbursement systems and policies, and he is well acquainted with the Washington Medicaid program and the conditions in the State's nursing home industry. His testimony was important in explaining the reasonableness of the State's reimbursement system and rates and was helpful in assisting the Court in understanding the economics of public health care as it relates to the Boren Amendment. The plaintiffs did not offer credible testimony to controvert Dr. Scanlon's opinions regarding health policy and the economics of the Medicaid program.

77. The Court accepts the testimony of Dr. Scanlon, with only two minor exceptions: 1) In disagreement with Dr. Scanlon, the Court does see in the quartile exhibits a trend toward lesser reimbursement of providers' costs during the years at issue. 2) The Court finds that the most accurate comparison of costs to rates should include an exact amount for the complete rates paid and an exact amount for all true costs.

78. The plaintiffs' principal expert, Mr. Humphrey, was not a credible witness. Consequently, Mr. Humphrey's opinions regarding the reasonableness of the State's reimbursement system and the adequacy of the State's Medicaid rates under the Boren Amendment did not carry significant weight.

79. Eleven points undermined Mr. Humphrey's credibility: One, he is a partisan on the side of the nursing homes; he is not an independent expert. Two, he is a stakeholder in this lawsuit because as a part owner of two nursing homes in the plaintiff class he has a substantial personal financial interest in the outcome. Three, he is a contingent fee expert; he was guaranteed five percent of any damage award the plaintiffs obtained. Four, he stands to get more income from accounting work if the plaintiffs prevail because he expects to divide the proceeds as judgment fund accountant, just as he did in a prior state court case, *United Nursing Homes, Inc. v. McNutt*, 35 Wash.App. 632, 669 P.2d 476, *review denied*, 100 Wash.2d 1030 (1983). Five, his testimony indicated that he was

the principal architect of this lawsuit, believing that this action would simply be a "mirror image" of the *McNutt* case, which it clearly is not. Six, he testified that the Washington reimbursement system started to go "sour" in 1985, yet his own actions belied this testimony since he invested around $450,000 in the system in 1986 with his expert's knowledge of the nursing home business. Seven, he kept changing the questions that he was asked on cross-examination instead of answering them straightforwardly. He tried to answer the questions he wanted to answer, rather than the questions asked.

80. Eight, not all of the necessary numbers were included in Mr. Humphrey's statistical analyses. He left out data that should and could have been included for a fair and realistic assessment of the reimbursement rates. Nine, as he himself testified, his analyses of the financial ratios of the providers were skewed by various factors, including the presence in the State of large corporate nursing home chains like Beverly Enterprises and Hillhaven Corporation. Ten, his testimony showed that his own nursing homes were engaged in the sort of financial manipulations of unallowable administrative and property costs— which he characterized as "shenanigans" in his direct testimony—that can skew the numbers that indicate a provider's financial performance, thus making it difficult to determine whether the reimbursement rates received are in fact adequate.

81. Eleven, Mr. Humphrey testified on cross-examination that providers get into the nursing home business for reasons other than just earning an operating profit. He testified that these other reasons include favorable tax deductions for depreciation, the investment potential of realizing a profit on the sale of the nursing home property, and the opportunity to engage in financial manipulations—like related-party leases and excess compensation—that provide ways to draw money out of the business for the owner's personal benefit. These reasons are very important considerations in determining the adequacy of Medicaid reimbursement rates, as Mr. Humphrey himself admitted, yet none of

these factors was included in his figures or analyses. The real meaning of depreciation was not well covered in his analyses, and his exhibits did not make it clear how the various forms of financial manipulations affect a provider's bottom line.

82. The plaintiffs' other expert witnesses, Mr. Huebner and Dr. Lowell Bassett, relied extensively on the statistical data and work of Mr. Humphrey, as well as Mr. Humphrey's approach to the Boren issue and his conclusions about reasonable rates. To the extent these experts' opinions depended on the work of Mr. Humphrey, they suffered from his same disabilities, and the Court has discounted the weight of their opinions accordingly.

## V. FINDINGS AND ASSURANCES

83. HCFA's regulations require HCFA approval of a state plan change in payment methods and standards. 42 C.F.R. § 447.253(a) (1988). Prior to October 26, 1987, this requirement applied only to significant changes. 42 C.F.R. § 447.253(a) (1986). Effective that date, the word "significant" was deleted from the regulation. See 52 Fed.Reg. 28147 (1987).

84. In order to receive HCFA's approval for changes in a state plan, the state Medicaid agency "must make assurances satisfactory to HCFA" that certain prescribed requirements are being met. Id. The assurance in dispute in this case tracks the Boren Amendment: "The Medicaid agency pays for ... long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." 42 C.F.R. § 447.253(b)(1) (1988). The regulations further require that "[w]henever the Medicaid agency makes a change in its methods and standards, but not less often than annually, the agency must make" certain findings that are identical to the assurances. 42

C.F.R. § 447.253(b) (1988). Although the assurances must be submitted to HCFA, the underlying findings do not have to be submitted.

85. No evidence was presented indicating that DSHS had failed to submit the required assurances to HCFA. Indeed, the evidence showed that the Department submitted the assurances each year between 1981 and 1988, with the exception of 1986, when there was no significant change in the Plan. Plaintiffs contend that the assurances merely parroted the language of the regulations and that the Department had not engaged in any bona fide process to make the findings to support the assurances. The evidence did not support this contention.

86. The testimony of Michael Wills, Kathy Marshall and Denise Gaither regarding the assurances and findings they prepared for HCFA's approval of the State Plans for 1984 through 1988 was credible. They were successively the managers of the reimbursement program and as such were the officials directly responsible for making the required findings and assurances.[1] Their testimony indicated a consistent practice and a consistent analysis by DSHS over the several years of their involvement. No evidence rebutted the persuasive testimony of Mr. Wills, Ms. Marshall and Ms. Gaither concerning the findings and assurances process undertaken by DSHS.

87. The testimony showed that DSHS made its findings in the following manner: As required by statute, cost reports were submitted on March 31, although extensions were available. Thereafter, the Department aggregated the information from the cost reports to compile an industry-wide total of raw reported costs, before desk review and the application of any lids or limitations. This total raw reported cost figure was generally available by early summer. The responsible Department officials then compared this figure to total reimbursement. For the years 1982 through 1987, the reimbursement was ap-

---

1. Plaintiffs did not call the individual who was responsible for making the findings and assurances in 1981, 1982 and 1983, although Mr.

Wills testified that he assisted this individual in 1983. (Testimony of Michael Wills, at 96.)

proximately 95% of raw reported costs. (Ex. 3.)[2] In 1988, reimbursement was 92% of raw reported costs. (Ex. A–340.) Of course, if the reported costs were limited to allowable costs, the percentages of reimbursement would be higher, but this data is not available by the time the annual findings have to be made.

88. The responsible officials then evaluated the ratio of reimbursement to costs in light of their knowledge of the nursing home industry. Foremost among their considerations was the fact that the quality of care provided by nursing homes in Washington is high. Mr. Wills, Ms. Marshall and Ms. Gaither all testified that in their role as managers of the reimbursement program they were well informed on the quality of care in the State's nursing homes through receipt of survey reports and frequent meetings with colleagues in the Department who were responsible for monitoring quality of care.

89. Furthermore, Mr. Wills, Ms. Marshall and Ms. Gaither were aware that there has been no shortage of persons willing and able to buy nursing homes in this State whenever a former provider decided, for whatever reasons, to leave the industry. When nursing homes were put up for sale, they invariably sold for an apparent profit. Whenever the State issued a license (called a Certificate of Need) to add additional nursing home beds, either through construction of new facilities or expansion of existing ones, there was brisk competition for these licenses. Mr. Wills, Ms. Marshall and Ms. Gaither considered all of this information in making their findings.

90. Armed with the knowledge that (1) the rates provided a high ratio of reimbursement to raw reported costs, (2) providers were able to provide good care at these rates, and (3) the rates were sufficient to attract providers to the industry whenever a nursing home or additional bed authorization became available, Mr. Wills, Ms. Marshall and Ms. Gaither concluded

that the rates met the standard of the Boren Amendment which is repeated in HCFA's regulations. Stated another way, these officials reasoned that if the State's rates were too low, one of two consequences would follow: either there would be a perceptible drop in the quality of care; or, if providers lost money providing requisite care at the State's rates, there would be an exodus from the industry and a dearth of new entrants. The fact that neither of these consequences was observed confirmed the officials' findings that the high ratio of reimbursement to raw reported costs was adequate and reasonable to meet the Boren Amendment standard.

91. In 1983 and 1985, HCFA conducted surveys of the Department's compliance with the Boren Amendment, the regulations, and the State Plan. In both of these surveys, HCFA looked behind the findings made by the Department and approved the methodology used by the Department and the conclusions it reached. In the 1983 survey, HCFA accepted the Department's finding that the ratio of reimbursement to reported costs was responsive to the federal regulations. (Ex. A–364 at 24.) In the 1985 survey, HCFA found that the required finding with respect to compliance with the Boren Amendment "appears to be reasonably substantiated." (Ex. A–365, "Executive Summary.") The survey further found that although the Department "did not have a formalized finding document ... there was information available to conclude that the payment rates were reasonable and adequate." (Ex. A–365, "Section II—Findings.") Mr. Wills, Ms. Marshall and Ms. Gaither testified that these expressions of approval from HCFA supported their belief that the methodology they used to make their findings was appropriate and that the findings themselves were proper.

92. The responsible Department officials engaged in a reasoned and comprehensive finding process to support the assurances they made to HCFA. The more

---

**2.** Exhibit 3 indicates that for 1987, the percentage was 91.3%. However, Ms. Gaither pointed out an error in the exhibit and testified without

contradiction that the percentage for 1987 was approximately 95%.

sophisticated statistical analyses presented by the Department at trial, discussed in paragraphs 65–70, *supra,* confirm the Department's annual findings.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331. The Court has pendent jurisdiction over plaintiffs' state law claims.

2. On September 13, 1989, the Court ruled that neither federal nor state law requires the defendants to reimburse the plaintiffs in full for their audited allowable costs. (Order Denying Plaintiffs' Motion for Partial Summary Judgment; and Granting Defendants' Motion for Partial Summary Judgment.) On the same date, the Court dismissed the plaintiffs' 42 U.S.C. § 1983 claims for retrospective relief under the Supreme Court's holding in *Will v. Michigan Dep't of State Police,* ⸺ U.S. ⸺, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), but ruled that the plaintiffs nevertheless had a federal cause of action for damages against the defendants directly under the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), and that this Court could entertain such a cause of action under 28 U.S.C. § 1331. (Order Denying Defendants' Motion To Dismiss Claims Based on Federal Law.) The conclusions of law contained in these two rulings are incorporated herein by reference.

## I. STANDARD OF REVIEW

3. The proper standard of review in this case is as follows: The burden of proof on all claims brought in this action is on the plaintiffs. To be entitled to relief, the plaintiffs must prove their factual claims by a preponderance of the evidence. *See Colorado Health Care Ass'n v. Colorado Dep't of Social Servs.,* 842 F.2d 1158, 1164 (10th Cir.1988). Where the Court is reviewing the legality of a state statute or a state regulation, the Court's review is de novo. The Court can also decide whether the statute or regulation is "contrary to law"—that is, whether it conflicts with a specific federal law or a superseding Washington statute or regulation. State stat-

utes and regulations carry a presumption of validity, which relates to the plaintiffs' burden of proof. *See California Hosp. Ass'n v. Schweiker,* 559 F.Supp. 110, 116 (C.D.Cal.1982), *aff'd,* 705 F.2d 466 (9th Cir. 1983).

4. Where the Court is reviewing the legality of state actions (that is, discretionary decisions made or actions taken by state officials), the Court's review is not de novo. The Court is limited to a determination of whether the state action is arbitrary or capricious or contrary to law. *See Amisub (PSL), Inc. v. Colorado Dep't of Social Servs.,* 879 F.2d 789, 799–800 (10th Cir. 1989); *Colorado Health Care,* 842 F.2d at 1164; *Mississippi Hosp. Ass'n v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). This standard of review requires that the Court uphold the discretionary actions of DSHS so long as they are "rationally connected to relevant factors or data" and do not conflict with a controlling statute or regulation. *Colorado Health Care,* 842 F.2d at 1167; *Friedman v. Perales,* 668 F.Supp. 216, 221 (S.D.N.Y.1987), *aff'd,* 841 F.2d 47 (2d Cir.1988). In this determination, the Court must show deference to the choices made by the state officials. *See California Hosp. Ass'n v. Schweiker,* 559 F.Supp. at 116.

## II. NON–BOREN AMENDMENT ISSUES

5. The central issue in this case is whether the Washington State reimbursement system violates the Boren Amendment. However, the plaintiffs also raised a number of other claims that defendants had violated the State Medicaid statute and, in one respect, the equal protection clause of the Fourteenth Amendment. All of these non-Boren Amendment issues were resolved in the Department's favor either as a matter of law before the presentation of any evidence or at the close of the plaintiffs' case-in-chief pursuant to Rule 41(b). The Court will first address these

subsidiary issues before turning to the Boren Amendment issues.

6. On the first day of trial, before hearing any evidence, the Court ruled on three issues as matters of law. The plaintiffs did not contend that any evidence was necessary to resolve these legal issues. The issues were:

(a) Whether the State violated the equal protection clause of the Fourteenth Amendment in its response to the federal Deficit Reduction Act of 1984 (DEFRA).

(b) Whether revisions adopted May 24, 1989, to WAC Chapters 388–96–210, concerning audits, and 388–96–221, concerning preliminary settlements, violate RCW 74.-46.105(9).

(c) Whether DSHS exceeded its statutory authority in adopting and applying limits on new construction costs as set forth in WAC 388–96–745.

7. At the close of the plaintiffs' case-in-chief, the Court dismissed several of the plaintiffs' claims pursuant to Fed.R.Civ.P. 41(b). Two of these claims were unrelated to the Boren Amendment:

(a) Whether DSHS violated the state statute in establishing plaintiffs' rates under the wage enhancement cost center.

(b) Whether DSHS has violated RCW 74.46.481(9) by failing to select the most representative index of cost increases for purposes of calculating the lid on nursing services cost increases.

## A. *The Equal Protection Challenge*

8. The Deficit Reduction Act of 1984, *inter alia,* amended the Social Security Act to provide that nursing home owners who purchased their facilities after July 18, 1984, could not receive the increased asset valuation for reimbursement purposes that was available to owners who purchased their facilities prior to that date. Pub.L. No. 98–369, § 2314, 98 Stat. 494, 1079 (1984). Subsequent to the enactment of DEFRA, the Washington State Legislature amended RCW 74.46.360(4) to conform to the federal mandate. In 1986, Congress modified section 2314 of DEFRA, effective October 1, 1985, to allow a limited step-up

in the valuation of assets following a sale. Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. 99–272, § 9509(a), 100 Stat. 82, 711 (1986) (COBRA). COBRA did not, however, mandate relaxation of restrictions imposed in response to DEFRA, and the Washington State Legislature did not amend RCW 74.46.360(4) in light of COBRA.

9. Plaintiffs contend that by creating two classes of nursing home owners—those who purchased their facilities before July 18, 1984, and those who purchased after—the State has violated the equal protection clause of the Fourteenth Amendment. However, the plaintiffs have cited no case law—and the Court is aware of none—that supports plaintiffs' contention.

10. Plaintiffs conceded at oral argument that the challenged legislation is economic regulation that does not burden fundamental constitutional rights or create "suspect" classifications, such as race or national origin. Accordingly, the distinction created by the statute is subject only to minimal judicial scrutiny and will be sustained if it is rationally related to some legitimate governmental objective. *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 174–76, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980). Moreover, if "there are plausible reasons" for the legislation, the Court's "inquiry is at an end." *Id.* at 179, 101 S.Ct. at 461. It is "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960).

11. In this case, there are two plausible reasons for the State's refusal to recognize a step-up in valuation basis for transfers on or after July 18, 1984. First, DEFRA made the restriction a requirement for federal participation in the State's Medicaid program. If the State had not conformed to DEFRA, it would have risked loss of the federal share of Medicaid payments, which is about 53% of the total. Second, the DEFRA provision itself was intended to curb the abuse inherent in requiring the Medicaid program to pay for the same capital assets more than once. This was the

stated reason for the DEFRA provision in the legislative history of that section. H.R. Rep. 98–861, 98th Cong.2d Sess. 1339 (1984) (Conference Report), *reprinted in* 1984 U.S.Code Cong. & Ad.News 697, 1445, 2027. It is also a plausible reason for the State to enact RCW 74.46.360(4) following the enactment of DEFRA and then to keep the State's provision in place even after COBRA permitted relaxation of the DEFRA restriction.

12. Furthermore, there is no support for plaintiffs' contention that it is unconstitutional to distinguish between owners who purchased their facilities before July 18, 1984, and those who purchased facilities thereafter. There are numerous cases establishing the basic rule that a legislature can change the law as of a certain date, even a retroactive date, so as to treat people that did something or owned something before that date differently than the ones that are in a like position after that date. *See, e.g., Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). When a legislature changes a law, it has to pick a date to make the change, and such line-drawing does not violate the equal protection principle. *See, e.g., Upholstered Furniture Action Council v. California Bureau of Home Furnishings,* 442 F.Supp. 565 (E.D. Cal.1977). Moreover, the statute at issue here provided that anyone who had an enforceable contract of sale, reached through an arms-length negotiation, before July 18, 1984, would get the increased step-up. Thus, the statute did not deprive anyone of the benefit of a bargain reached prior to the effective date, and it permitted those who had not yet closed a deal on the effective date to negotiate on the basis of the new statutory restriction. There was no unfairness in the statute.[3]

B. *The Amendment to the Audit and Preliminary Settlement Regulations*

■ 13. The amendment to WAC 388–96–210 directs DSHS auditors to apply the

lids prescribed for the nursing and A & O cost centers, beginning with audits of 1987 cost reports that were commenced during 1989. Historically the auditors have not applied the lids in conducting their audits. The amendment to WAC 388–96–221 similarly directs DSHS staff to apply these lids in conducting preliminary settlements, beginning with the preliminary settlements issued in July 1989. Both amendments became effective on June 23, 1989.

14. During argument on this issue, it became clear that the plaintiffs did not seriously contend that the Department had violated the Administrative Procedure Act or the Boren Amendment in enacting these amendments, as had been asserted in the Pretrial Order. Instead, plaintiffs' challenge focused on whether DSHS had violated RCW 74.46.105(9), which provides: "All audit rules adopted after March 31, 1984, shall be published before the beginning of the cost year report to which they apply." Since the amendments were published on May 23, 1989, plaintiffs contend that they cannot be applied until the 1990 cost reports.

15. Since WAC 388–96–221 applies to preliminary settlements and not to audits, it is not governed by RCW 74.46.105(9). Accordingly, the Department did not violate RCW 74.46.105(9) in amending that regulation.

■ 16. Contrary to DSHS's view, WAC 388–96–211 is an audit rule and therefore is governed by RCW 74.46.105(9). However, that is not the end of the inquiry, because the next question is, "So what if the amended regulation is an audit rule within the meaning of the statute?" In response to this question, the Court concludes that the substance of the amendment—directing auditors to apply the statutory lid mechanisms—is not a necessary audit rule that has to be included in the Administrative Code. Instead, it is the type of direction to

---

**3.** In concluding pretrial, as a matter of law, that RCW 74.46.360(4) did not violate the equal protection clause, the Court did not reach the question of whether that provision governing depre-

ciation resulted in rates that violated the Boren Amendment. That issue necessarily awaited the evidence to be adduced at trial.

auditors that could be made without including it in the Administrative Code. The State plainly has authority to direct auditors how to perform their audits within the scope of the statute and Administrative Code regulations without issuing rules on every detail of how the auditors are to do their work.

■ 17. If plaintiffs believe that it is improper for the auditors to apply the lid mechanisms, then the proper time to raise that issue is after the auditors have completed their audits when a provider may allege that he or she has been injured by the new procedure. At that point, a provider could make a challenge that application of the lids is arbitrary or capricious or in violation of law. Since plaintiffs did not allege that any of the audits in which the lids are being applied had been completed at the time of trial, any claim plaintiffs might have arising out of this new audit procedure was not ripe and was not part of this case.

C. *The Construction Cost Regulation*

■ 18. Plaintiffs also contend that WAC 388–96–745 exceeds the Department's statutory authority. That regulation provides in pertinent part:

When a new facility is constructed after obtaining a certificate of need, the department shall determine allowable land cost and building construction cost. Reimbursement for such allowable costs, determined pursuant to the provisions of this chapter, shall not exceed the maximums set forth in this subsection and in subsections (4) and (5) of this section.

Subsection (4) sets out tables of maximum construction costs on a per bed basis. Plaintiffs contend that these construction limits are in excess of the Department's authority.

19. Plaintiffs' contention is without merit. The Department has broad authority to issue regulations "to carry out the policies and purposes" of RCW Chapter 74.46. RCW 74.46.800. WAC 388–96–745 is clearly within the scope of this general authority. Furthermore, plaintiffs have not identified any section of Chapter 74.46

which limits the Department's authority to issue the challenged regulation. Although plaintiffs referred the Court to RCW 74.-46.510, there is nothing in WAC 388–96–745 that is inconsistent with that statute.

D. *The Wage Enhancement*

■ 20. Plaintiffs did not adduce any evidence that DSHS did anything wrong in its implementation of the wage enhancement cost center. The facts concerning this claim are set forth in paragraphs 44–45 of the Findings of Fact, *supra*, and they demonstrate that the Department proceeded reasonably and in accordance with the state statute. The state Medicaid statute clearly places the burden on providers to submit complete reports, as required by the Department, to enable the Department to set rates. RCW 74.46.030, .060, .475. The contracts between the Department and the providers also make clear that the burden is on providers to submit the information the State needs. (Ex. 113.) The Department provided at least two opportunities for providers to submit the information necessary to calculate the wage enhancement. If providers still failed to submit the information, they got an enhancement based on available information in the most recent cost reports. Providers who did not submit the required information are not entitled to more than they received. There is no evidence that the Department acted arbitrarily, capriciously, or in violation of law in this matter, and the Court therefore dismissed this claim pursuant to Fed.R. Civ.P. 41(b).

E. *The Nursing Services Cost Index*

■ 21. Similarly, plaintiffs failed to make out a case in support of their contention that DSHS is acting improperly in using the MC–CPI to calculate the nursing services cost lid. RCW 74.46.481(5) provides:

The department shall select an index of cost increase relevant to the nursing and related services cost area. In the absence of a more representative index, the department shall use the medical care

component index as maintained by the United States bureau of labor statistics.

22. The Department has interpreted this statute as requiring the selection of an existing index rather than requiring the Department to develop its own index, as plaintiffs contend. This is a reasonable interpretation of the statute by the agency committed to administering it, and the Court will not disturb that interpretation.

23. There is no evidence that DSHS acted arbitrarily, capriciously, or in violation of law in this matter, and the Department is entitled to have this claim dismissed pursuant to Rule 41(b).

III. BOREN AMENDMENT ISSUES

24. Before addressing plaintiffs' specific claims, it is necessary to set forth some background on the statutory and regulatory framework. Each state participating in the Medicaid program is required to have a state plan that must be approved by the Secretary of the U.S. Department of Health and Human Services through HCFA. 42 U.S.C. § 1396a. Under the Boren Amendment, the state plan must provide for payment to nursing homes through the use of Medicaid reimbursement rates that:

the State finds, and makes assurances satisfactory to the Secretary [of Health and Human Services] are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards....

42 U.S.C. § 1396a(a)(13)(A). In its implementing regulations, HCFA has set forth the specific findings that a state Medicaid agency must make and the assurances that must be submitted to HCFA for approval of a state plan. 42 C.F.R. § 447.253.

25. The Boren Amendment to Title XIX was enacted as part of the Omnibus Budget Reconciliation Act of 1980, Pub.L. No. 96–499, § 962(a), 94 Stat. 2599, 2650 (1980) (OBRA). The purpose behind OBRA was "to reduce the federal budget [and the Boren Amendment itself] aims to promote this purpose by implementing a more cost-efficient Medicaid scheme." *Virginia Hosp. Ass'n v. Baliles,* 868 F.2d 653, 659 (4th Cir.), *cert. granted,* —— U.S. ——, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989). In establishing the Boren standard for Medicaid reimbursement, Congress intended to increase considerably the flexibility of state agencies to develop payment systems that encourage cost containment and efficiency. *Colorado Health Care,* 842 F.2d at 1165. Congress specifically enacted the Amendment in order to reduce federal oversight and allow states to manage the inevitable budgetary constraints resulting from reduced federal funding in the 1980s. *Wisconsin Hosp. Ass'n v. Reivitz,* 733 F.2d 1226, 1228 (7th Cir.1984); *Wilmac Corp. v. Heckler,* 633 F.Supp. 1000, 1007 (E.D.Pa. 1986). The Amendment represents a broad delegation of authority and discretion to the state agencies that oversee Medicaid reimbursement. *Hoodkroft Convalescent Center v. New Hampshire Div. of Human Servs.,* 879 F.2d 968, 972, 975 (1st Cir.1989).

26. Medicaid payment rates are "reasonable and adequate" within the meaning of the Boren Amendment if they fall within a "zone or range of reasonableness." *Colorado Health Care,* 842 F.2d at 1167; *Wisconsin Hosp. Ass'n,* 733 F.2d at 1233. The "range of reasonableness" concept means that a determination by the Court that one particular payment rate is reasonable and adequate does not imply that all other rate levels the State may choose are "unreasonable." *Wisconsin Hosp. Ass'n,* 733 F.2d at 1233. The Boren Amendment does not prescribe any precise rate or percentile of Medicaid reimbursement.

27. The range of reasonableness doctrine applies whenever courts evaluate administrative rate-making against a statutory reasonableness standard. *Wisconsin Hosp. Ass'n,* 733 F.2d at 1233; *see Federal Power Comm'n v. Conway Corp.,* 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976); *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). The doctrine

recognizes that rate-making is an inexact science and that rate-making agencies must be allowed "a substantial spread between what is unreasonable because too low and what is unreasonable because too high." *Federal Power Comm'n*, 426 U.S. at 278, 96 S.Ct. at 2004 (quoting *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951)). The allowable "spread" for Medicaid rate payments is especially broad because of Congress's intent in enacting the Boren Amendment of conferring greater flexibility on the state agencies.

28. Before addressing the central question of whether the State's reimbursement rates were reasonable and adequate within the meaning of the Boren Amendment, there are four subsidiary issues related to the Boren Amendment that should be addressed. All of these issues were decided by the Court pursuant to Fed.R.Civ.P. 41(b) at the close of plaintiffs' case-in-chief. They are:

(a) Whether the principle set forth in RCW 74.46.150(1) of making final annual settlement with providers at the lower of their audited allowable costs or their reimbursement rates is inconsistent with the State Plans in effect for the years between 1981 and 1988;

(b) Whether the Boren Amendment requires a State to set a specific percentile at which providers will be reimbursed in full;

(c) Whether the Boren Amendment requires the State to set rates that include a reasonable return on investment in addition to meeting the costs that must be incurred by efficiently and economically operated facilities in order to meet requisite care and safety standards;

(d) Whether DSHS has complied with HCFA's regulations regarding the assurances submitted to HCFA in support of the Plan and the underlying findings.

## A. *The Settlement Principle*

29. As noted above, the Court ruled prior to the trial that the Boren Amendment does not require the State to reimburse providers for all their audited allowable costs. At trial, the plaintiffs attacked the statutory principle of settling at the lower of audited allowable costs or rate, RCW 74.46.150(1), from a somewhat different angle. They contended that the State Plans for the years 1981 through 1988, which were approved by HCFA, do not include this principle and therefore RCW 74.46.150(1) is inconsistent with the federally approved Plans. Plaintiffs further argued that because the Plans allegedly did not contain the settlement principle they were not "comprehensive," as required by HCFA's regulations, and therefore never should have been approved by HCFA. Defendants responded that HCFA's approval of the Plans should be given deference, and that, in any event, the Plans are sufficiently comprehensive because they incorporate the whole of RCW Chapter 74.46 by reference.

30. HCFA regulations indicate that "[t]he State plan is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements" of the Medicaid statute and HCFA's regulations. 42 C.F.R. § 430.10 (1988). The regulation further says that "[t]he State plan contains all information necessary for HCFA to determine whether the plan can be approved to serve as the basis for Federal financial participation (FFP) in the State program." *Id.* This language indicates that the purpose of the requirement of comprehensiveness is to enable HCFA to decide whether to approve the Plan. In other words, the comprehensiveness of the Plan needs to be measured not in terms of how a lay person or how a provider would look at comprehensiveness, but rather how HCFA looks at comprehensiveness. HCFA has been satisfied with the comprehensiveness of the Plans throughout the relevant period.

31. Furthermore, the dictionary defines comprehensive as "covering completely or broadly." *Webster's New Collegiate Dictionary* 232 (1975). The requirement of comprehensiveness does not require the State to repeat each section of the state Medicaid statute in the Plan and that incor-

poration by reference is acceptable. Indeed, construing comprehensiveness to require verbatim recitation of each section of the state statute would lead to an absurd result. The idea of payment at the lower of cost or rate is in each of the Plans at issue here, either explicitly or by incorporation. The Plans are sufficiently comprehensive, both under the ordinary meaning of the word and under the regulatory definition, which requires that the plan be sufficient for HCFA to carry out its responsibilities. The Plans provide sufficient notice to HCFA. Moreover, the providers were well aware that the State settled at the lower of cost or rate, and there was no evidence that anyone was blind-sided by this principle. The principle was well known to all, or at least it was reasonably discoverable. It was not unfair to apply this principle under the circumstances of this case.[4]

### B. *Specific Percentile for Full Reimbursement*

██ 32. There is no legal support for plaintiffs' contention that the Boren Amendment requires the State to set a specific percentile at which providers will be reimbursed in full. The Boren Amendment does not require full reimbursement of costs or any particular percentage of reimbursement. As noted above, the reasonableness requirement of the Boren Amendment "has been characterized as a zone, not a pinpoint." *Colorado Health Care Ass'n*, 842 F.2d at 1167. It is "a zone or range in which a State may consider the relevant factors and data and determine a valid reimbursement rate which is reasonable and adequate." *Id.*

33. HCFA has reached the same conclusion in construing the Boren Amendment. It has stated that the statutory term "reasonable and adequate" "is not a precise number, but rather a rate which falls within a range of what could be considered reasonable and adequate." 48 Fed.Reg.

58046 (Dec. 19, 1983). As the agency charged with implementing the Boren Amendment, HCFA's views are entitled to substantial deference.

34. Since the Boren Amendment does not require any specific level of reimbursement, it follows that the State is not required to set a specific percentage of providers who will be reimbursed in full. The percentile measurement system is one way that a state, or a court, can measure whether the Boren Amendment is being met, but it is not the only way. Although Washington uses the percentile system in the A & O cost center, it has not adopted percentile measurements for other cost centers. The use of a percentile approach in one cost center does not mean that the same approach must be adopted by the State across the board.

35. Plaintiffs relied on the decision in *United Nursing Homes, Inc. v. McNutt*, 35 Wash.App. 632, 669 P.2d 476, *review denied*, 100 Wash.2d 1030 (1983), in support of their contention that the Boren Amendment requires the State to set a specific percentile of providers who will be reimbursed in full, but that reliance is misplaced. The trial court in *McNutt* used that approach and made a finding in regard to the 93rd percentile, but the appellate court indicated that it expressed no opinion on that part of the trial court's decision. 669 P.2d at 482 n. 7. That issue was not the subject of the appeal. More importantly, the *McNutt* case had to do with years prior to the years at issue here and prior to the Boren Amendment. That case was decided under a different law that is not relevant here, and the appellate court made no conclusion that would be binding on the State in the period under consideration in this case.

### C. *Reasonable Return on Investment*

36. The Boren Amendment also does not require a state to set rates that include

---

**4.** Plaintiffs argue that the 1982 Plan (Ex. 14) was defective because the principle of payment at the lower of cost or rate was in the rate-setting section of the Plan rather than in the payment section. That is a distinction without a difference. There is no separate payment section in the 1982 Plan, and under all the circumstances of that Plan, the rate-setting system described therein clearly included the payment system.

a reasonable return on investment. *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 461 n. 35 (E.D. Mich.1982). While a state is free to provide such a return, it is not required to do more than meet the costs that must be incurred by an efficiently and economically operated facility to provide legally requisite care. These necessary costs do not include profit or return on investment, as HCFA has long maintained in its interpretation of the Medicaid statute. 46 Fed.Reg. 47964, 47965 (Sept. 30, 1981); 43 Fed.Reg. 4861 *et seq.* (Feb. 6, 1978); 41 Fed.Reg. 27300, 27303 (July 1, 1976).

### D. *Findings and Assurances*

■ 37. The plaintiffs attacked the adequacy of (1) the assurances DSHS provided to HCFA that the State's reimbursement rates satisfy the Boren Amendment, and (2) the corresponding findings underlying these assurances. HCFA must receive assurances satisfactory to it in order to approve a Plan. As noted above, prior to October 1987, the assurances were required to be filed with HCFA whenever the State made a significant change in the Plan and after October 1987 whenever the State made any change. The findings, which do not have to be submitted to HCFA, must be made whenever assurances are made but not less often than annually. 42 C.F.R. § 447.253 (1988); 42 C.F.R. § 447.253 (1986).

38. The procedural requirements of the federal regulation are satisfied if DSHS has engaged in "a bona fide finding process" and has made assurances to HCFA based on its findings. *Amisub (PSL), Inc.,* 879 F.2d at 797. DSHS "is free to create its own method for arriving at the required findings." *Id.* The finding process does not require any special studies or written findings. *Colorado Health Care,* 842 F.2d at 1168; *Mary Washington Hosp., Inc. v. Fisher,* 635 F.Supp. 891, 897 (E.D.Va.1985). It is sufficient if DSHS has considered, on the basis of some reasonably principled analysis, whether its payment rates meet the substantive requirements of the Boren Amendment. *Thomas v. Johnston,* 557 F.Supp. 879, 910 (W.D.Tex.1983); *see Colo-*

*rado Health Care,* 842 F.2d at 1168. In deciding whether the defendants have met their "findings" and "assurances" obligations for the State Plans at issue here, the Court's review is limited to whether DSHS has acted arbitrarily, capriciously or contrary to the specific requirements of federal law. *See Coalition of Michigan Nursing Homes,* 537 F.Supp. at 459.

39. In considering the adequacy of the Department's findings and assurances, two cases deserve special attention, *Amisub (PSL),* 879 F.2d 789, and *Pinnacle Nursing Home v. Axelrod,* 719 F.Supp. 1173 (W.D.N.Y.1989). Other cases cited by plaintiffs on this issue are not very helpful because the facts in those cases were very different from the facts of this case.

40. The *Amisub* case involved an attack on a state plan that was very different from Washington's plan, but the case is still significant for its discussion of the law. The Court said that "[t]he plain language of the federal Medicaid law mandates the State Medicaid Agency *at a minimum,* to make 'findings' which identify and determine (1) efficiently and economically operated [facilities]; (2) the costs that must be incurred by such [facilities]; and (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated [facilities]." 879 F.2d at 796 (emphasis in original). Plaintiffs relied heavily on *Amisub* for the proposition that the State must define what is an economically and efficiently operated facility. It is important to recognize, however, that the *Amisub* decision does not require *definition* but only *identification* and *determination* of such facilities.

41. This distinction is consistent with HCFA's interpretation of the Boren Amendment. HCFA has specifically rejected the suggestion that states should be required to define efficient and economically operated facilities, because "the State's methods and standards implicitly act as the State's definition of an efficiently and economically operated facility." 48 Fed.Reg. 96049 (Dec. 19, 1983).

42. Under Washington's Medicaid statute, the identification of efficiently and economically operated facilities is closely tied to, and is part of, the rate-setting process. Under RCW 74.46, these are not two separate processes, but are done together. Individual rates are set on the basis of standards and methods enacted by the Legislature, and the rate that comes out at the end is based on an analysis of what rate is required to pay an efficiently and economically operated nursing home. Thus, the State's rate-setting process determines rates that are sufficient to pay the costs that must be incurred by economically and efficiently operated nursing homes. The rates produced by the rate-setting process are not necessarily the minimum required by the Boren Amendment, but they are within the range or zone required by Boren.

43. In Washington's system, rate-setting and the identification of efficiently and economically operated facilities are all part of the same process. The State has made, in its rate-setting process and in its whole program, findings that identify and determine efficiently and economically operated facilities and payment rates that are reasonable and adequate to meet the reasonable costs of those efficiently and economically operated facilities. Washington's Medicaid system does what is required by the *Amisub* opinion, even though the system does it in one step rather than in three separate distinct steps. Given the latitude which the Boren Amendment confers on states, there is nothing wrong with this approach to complying with the Boren Amendment.

44. The *Amisub* decision also teaches that "[t]here is a presumption that a state will engage in a bona fide finding process before it makes its assurances to HCFA that the required findings have been made." 879 F.2d at 797. The Court further stated that a reviewing court "must determine whether the agency action was based upon 'a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 800 (quoting *Citizens to Preserve Overton Park v.*

*Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Furthermore, the court's "task is to determine if there was a reasonable factual basis to support the State Medicaid Agency's findings and assurances...." *Amisub (PSL),* 879 F.2d at 800. A "state must articulate 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)). This guidance demonstrates that the reviewing court should not substitute its judgment for the state's if the state has considered relevant facts and made choices that have a rational connection to those facts. Here, DSHS considered the relevant factors, did not make a clear error of judgment, and articulated a rational connection between the facts found and the choices made. There was a reasonable factual basis to support DSHS's findings and assurances.

45. In *Amisub,* the court of appeals ruled that the "evidence at trial [was] flagrantly devoid of any effort to make the federally required findings." 879 F.2d at 796. The plaintiffs argued that the same must be said here, but the Court disagrees. As set forth more fully below, the plaintiffs did not present sufficient credible evidence to overcome the presumption that the State engaged in a bona fide finding process. The evidence adduced during the plaintiffs' case-in-chief showed that DSHS has engaged in a bona fide finding process. The State would have prevailed on this issue even if it had been required to carry the burden of proof.

46. In the *Pinnacle* case, the trial judge said that "[t]he State's assurances are best evaluated in a direct comparison with the Federal regulation which mandates their submission." 719 F.Supp. at 1178. Having made that comparison, the judge found that "[t]he assurances are patently and painfully insufficient, constituting nothing more than a formalistic recitation of the federally mandated requirements of a Medicaid plan." *Id.* at 1179–80.

47. This Court has conducted a similar comparison between DSHS's assurances for the relevant years and the HCFA regulation, but has come to a different conclusion than the court did in *Pinnacle.* In many instances, the Department's assurances parrot the language of the federal requirements, but there is nothing inherently wrong with that, because that is what HCFA requires the State to submit. The question is not solely whether the assurances parrot the regulations but whether the State has gone further than merely parroting the regulations.

48. The evidence shows that DSHS did much more than merely parrot the regulations. The finding process conducted by Mr. Wills, Ms. Marshall, and Ms. Gaither, set out in paragraphs 87–91 of the Findings of Fact, *supra,* was far more than a formal recitation of the federal requirements. Instead, it addressed and answered the requirements of the federal regulations. As noted above, these witnesses were credible and believable, and plaintiffs made no successful challenge to their testimony.

49. The witnesses indicated that they kept track of survey problems regarding quality of care. They also kept track of providers coming in and going out of the system through the certificate of need process and sales of nursing homes and the like. That was done on an informal in-house basis through consultation with colleagues who were responsible for the survey process and the certificate of need process. They used this information to make factual findings, which are reflected in the assurances, that the State's reimbursement rates were adequate to maintain the required level of care and would not adversely affect the nursing home economy. There was no successful attack made on the information that these witnesses cited or referred to. The information may be subject to interpretation, but there is no indication that the witnesses' interpretation of that information was unreasonable. Their findings satisfied HCFA, which conducted surveys of the finding process, and

their findings also satisfy all legal requirements. The responsible officials analyzed a wide variety of information in coming to their conclusions. The information supports the findings, and the findings support the State's assurances.

50. Some of what the DSHS officials did in making findings and assurances was based on informal rather than formal gathering of information and analysis. They did not write up every finding with all the evidence that supported that finding each year. Although such written findings would be helpful for purposes of judicial review, written findings are not required by statute or regulation.

51. The plaintiffs also argued that the Department's finding process, rather than being bona fide and objective, was merely an exercise to make the best case to support the State's rates and that Department officials considered only those factors favorable to their position while failing to consider relevant factors that were unfavorable. If this were true, the findings would not be proper. *California Hospital Ass'n,* 559 F.Supp. at 117. However, the evidence does not support plaintiffs' assertion that the finding process was "result-oriented." In fact, the finding process was *bona fide* and objective.

E. *Substantive Compliance with the Boren Amendment*

52. As a result of the rulings made before trial and at the conclusion of the plaintiffs' case-in-chief, all issues were resolved except the question of whether the rates paid under Washington's Medicaid statute, RCW Chapter 74.46, comply with the substantive standards of the Boren Amendment—*i.e.,* whether the rates are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities to provide the standard of care required by federal and state statutes and regulations. The evidence established that the rates prescribed by RCW Chapter 74.46 satisfy the Boren Amendment.[5]

**5.** In addition to the question of substantive com-      pliance with the Boren Amendment, the ques-

■ 53. For purposes of determining whether the State's rates fall within the range of reasonableness, it is the entire reimbursement payment taken as a whole that is relevant, not the particular components that comprise the rate. *Colorado Health Care,* 842 F.2d at 1167. Even if payments in one cost center are less than reasonable and adequate, there may be no violation of the Boren Amendment because the proper analysis under the Amendment focuses on the total rate.

■ 54. There are several "soft" numbers in Washington's reimbursement rate that are not related to real out-of-pocket costs. The depreciation allowance is one of these "soft" areas. Others include the 11% financing allowance, the working capital allowance, and the variable return allowance. These areas of reimbursement make up for possible shortfalls in other cost centers that are related to real costs, such as nursing services. Federal law does not require the State to provide a profit for Medicaid nursing homes. *See* paragraph 36, *supra.* However, if the State does choose to include in its rate an opportunity for profit, such as the ROI payment, that component must be included in the overall payment for purposes of the *Boren* range of reasonableness review. The plaintiffs' expert witnesses repeatedly concentrated only on part of the reimbursement payment made by the State. Their analyses persistently left out significant components of the rate, such as ROI and other "soft" areas. The plaintiffs' item-by-item evidence attacking the rates was never tied together in a sufficiently clear picture to show that the rates in fact are not sufficient under the Boren Amendment.

■ 55. For the reasons discussed below, the Court concludes that the Medicaid rates paid by the defendants during the relevant period were well within the range of reasonableness, and therefore the defendants have complied with the requirements of the Boren Amendment. The plaintiffs have failed to meet their burden of proof on their Boren claim; however, even if the burden had been on the defendants, the defendants would have prevailed on the evidence before the Court.

56. A substantial percentage of homes at all cost levels have received sufficient reimbursement during the years at issue here, with homes in the lower cost quartiles receiving greater percentages of reimbursement. This is significant because there may be efficiently and economically operated nursing homes even among those at the high cost end. The reimbursement pattern shown here demonstrates that the Washington system has paid rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities. The plaintiffs have failed to offer any credible evidence to indicate that the rates paid have not covered the necessary costs of efficient and economical providers. They have not produced convincing evidence that providers are suffering financially under the State's Medicaid program.

■ 57. The plaintiffs claimed that because of the 18–month lag in reimbursement that results from the annual rebasing methodology, the rates paid by DSHS have failed to compensate adequately for the inflation experienced by the providers, especially the inflation due to the rising costs of inputs like nurses' wages. However, the plaintiffs have failed to carry their burden of showing any Boren Amendment violation with respect to a possible inflation lag. In analyzing the impact of the lag, their experts focused only on the IAF rate increase prescribed by the legislature, rather than the total rate provided by DSHS. There are other components in the reimbursement rate that must also be considered in determining the extent to which

---

tion of whether the State had complied with the contracts it entered into with providers also remained at the close of plaintiffs' case. Those contracts, however, merely obligate the State to comply with applicable state and federal statutes, principally the Boren Amendment, and do not impose any additional duties on the State.

(Exs. 112 & 113.) Thus the question of whether the State complied with the contracts is co-extensive with the question of whether the State had complied with the Boren Amendment. Since the State prevailed on that issue, it necessarily prevailed on the contract issue.

the State covers the providers' necessary cost increases. Moreover, the plaintiffs did not include in their analyses the cost-containment objectives of the Washington system and the Boren Amendment.

58. The plaintiffs measured the adequacy of rate increases against their own cost increase experience. Such an approach assumes that all of their actual cost increases have been necessary, and it leaves the State no room to attempt prospective cost containment through rate-setting. That result would be inimical to the design of the Medicaid program under the Boren standard. Instead, measured against an objective, external index of cost increases in the nursing home industry, the total rates paid by DSHS have reasonably kept pace with inflation.

59. The plaintiffs argued to the Court that the reimbursement rates paid by DSHS have been arbitrarily determined by the State's budgetary needs and thus do not bear any reasonable relation to the necessary costs of providers and do not account for economic trends and conditions in the nursing home industry. While budgetary constraints may be a legitimate factor in establishing Medicaid rates, a state can not justify failure to meet the Boren Amendment standard on the basis of budgetary imperatives. *Amisub (PSL),* 879 F.2d at 800–01; *Wisconsin Hospital Ass'n,* 733 F.2d at 1235–36; *Mississippi Hospital Ass'n,* 701 F.2d at 518; *Illinois Council on Long Term Care v. Miller,* 579 F.Supp. 1140, 1148 (N.D.Ill.1983); 48 Fed. Reg. at 56051 (Dec. 19, 1983). Consideration of budgetary constraints will invalidate rates only if those rates fall below the Boren standard, which has not happened in Washington.

60. In this case, the plaintiffs offered no evidence at trial that the rates paid by DSHS are "dictated" by the budget arm of the State through OFM, as they claimed. To the contrary, the budget process for the most part is separate from the rate-setting

process and OFM does not have authority to reduce reimbursement for nursing home services to meet the State's budget goals. OFM treats the nursing home program as an entitlement program that is not subject to cut-backs. The IAF that is added to the biennial budgets for the nursing home long-term care program—like the IAF that is added on to the interim rates paid to nursing home providers—is not an arbitrary "budget factor" but is rather a bona fide index of general inflation. Moreover, the IAF is not the only inflation factor built into the biennial budget process. Substantial increases in the budget are also allowed for rebasing and "rate creep" (*i.e.,* current funding and exceptional care rate increases). Finally, if the biennial budget turns out to be insufficient to cover the nursing home program's reimbursement needs, DSHS simply requests a supplemental budget appropriation and OFM and the Legislature regularly approve such requests.

61. The plaintiffs suggested several specific levels or percentiles of reimbursement that they claim are required by the Boren Amendment. The plaintiffs argued that the case law supports the imposition of such specific payment levels. None of the particular levels of reimbursement urged by the plaintiffs is categorically required by the Boren Amendment, however. Other cases in other states that have discussed particular levels or percentiles of reimbursement do not require the Washington State Plan to guarantee similar rates of reimbursement.[6] Those cases involved different kinds of state plans with different rate-setting methodologies. The plaintiffs have not demonstrated that the rates resulting from the Washington rate-setting methodology fall short of meeting the necessary costs of efficient and economical providers, and the Court, therefore, will not disturb that methodology.

---

**6.** *E.g., Mississippi Hospital Ass'n,* 701 F.2d 511; *Troutman v. Cohen,* 588 F.Supp. 590 (E.D.Pa.), *aff'd,* 755 F.2d 920 (3d Cir.1984); *Nebraska Health Care Ass'n v. Dunning,* CV 82–L–472, 1984 WL 13987 (D.Neb. July 9, 1984), *aff'd in*

*part, vacated in part and remanded,* 778 F.2d 1291 (8th Cir.1985), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987); *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451.

62. None of the plaintiffs' analyses of reimbursement levels takes into account the multitude of reasons why providers enter and remain in the nursing home business—reasons that go beyond the opportunity to earn a simple operating profit. These reasons include, but are not limited to, for example, the opportunity to obtain real estate or tax benefits and the opportunity to engage in financial manipulations that result in personal income to the owner of the facility. Such considerations are important to an analysis of the adequacy of Medicaid reimbursement. None of the statistical analyses presented in this case were completely reliable because they did not show the effect of such considerations on whether owners and operators are in fact making money on the rates provided, and because each statistical analysis left out some information necessary to a complete and reliable analysis.

Washington's reimbursement rates are reasonable and adequate. Plaintiff did not bear its burden of proving them unreasonable, inadequate, or in violation of the Boren Amendment.

## CONCLUSION

Defendants are entitled to judgment of dismissal of all claims, and their costs.

## APPENDIX

TRANSCRIPT OF COURT'S ORAL DECISION BEFORE THE HONORABLE ROBERT J. BRYAN UNITED STATES DISTRICT JUDGE.

Filed Jan. 22, 1990

MORNING SESSION

THE COURT: The first order of business today is to rule on the various motions raised at the conclusion of plaintiffs' case. I think the best way to do that is to address them one at a time, as we argued them, from the pretrial order. I will make some findings and conclusions orally, I guess, as I go on some of these matters. It will take me some time to wander through this. I will try not to take too much time with some of these things, but I want to comment on a few things as we go.

The first issue was labeled 2(a), whether the settlement principle set forth in the statute is inconsistent with the state plans for particular years. This is the question of payment at the lower of cost or rate and whether that complies with, and is consistent between, the statute and state plans.

The plaintiff has argued basically that the plans were insufficient because they were not comprehensive as required in the code of federal regulations. I noted in— let's see if I can put my hand on this. I'm going to have to refer to some things, and some of them may be hard for me to find here as we go along.

45 CFR defines the term "comprehensive," and as I indicated, the plaintiff argues that the state plans were not comprehensive. 45 CFR, Chapter 11, Section 201.-2, indicates that "The State plan is a comprehensive statement submitted by the State agency describing the nature and scope of its program and giving assurance that it will be administered in conformity with the specific requirements stipulated in the pertinent title of the Act, the regulations," etc. "The State plan contains all information necessary for the Administration to determine whether the plan can be approved, as a basis for Federal financial participation in the State program."

That language indicates that the comprehensiveness of the plan is a requirement for the purpose of the United States' approval of it, or the administration's approval of it. I think, in other words, the comprehensiveness of the plan needs to be measured not in terms of how some lay person or how providers would look at comprehensiveness, but rather how the administration looks at comprehensiveness, and we know from the record here that they're satisfied with the comprehensiveness of the plan.

Now, that measure, I guess, doesn't answer the question wholly. I looked in the dictionary at comprehensive, also. It said, "Covering completely or broadly." I guess the bottom line is that incorporation by reference is okay, and in many of these plans, of course, the critical language was

incorporated by reference to a statute. The alternative to that is to repeat all of the statutes and regulations, federal and state, in the plan, and that's, I think, an absurd result—if we require these plans to be comprehensive to that extent.

One way or another, this idea of payment at the lower of cost or rate is in all of the plans at issue here. The plans are sufficiently comprehensive, both under the ordinary meaning of the word and under the CFR definition, if you will, which makes the requirement one that the administration can figure out from the plan. Certainly they can figure out this question of payment at lower of cost or rate from the plan should they want to do so.

Finally, on this issue, I want to say that no one was blind-sided in this deal, that I know of. The principle was well known to all. It was reasonably discoverable, or discovered, and it was not an unfair principle to apply under the circumstances of this case.

There was one other argument I should address, and that is that in Exhibit 14, which was the 1982 plan, this principle of payment at lower of cost or rate was not covered because the subject language was in the rate setting section rather than the payment section. It seems to me that's a distinction without a difference. I noted that there was no separate payment section in that plan, separate from the rate setting section, and under all the circumstances of that plan and the things that it referred to, the rate setting system clearly includes the payment system.

The defendants have a right to a dismissal on that particular issue. I guess dismissal is not the right word. Plaintiffs have not made out a case on that theory.

The second issue was labeled under paragraph 2(e). There are alternative wordings in the pretrial order on that issue, and there are really two questions raised. The first is whether the Boren Amendment requires that the state set a specific percentile at which providers are reimbursed in full, and the next question, which depends on the first, is what percentile would that

be. My answers to those questions are, basically, in regard to the first question, it's no. The percentile is not required, and that makes the second question moot.

The percentile measurement system, if you will—or theory, or whatever—is one way that a state can measure, or that a court can measure whether the Boren Amendment is being met, but it's not the only way. It has not been globally adopted in Washington State, not adopted across the board, although there has been some reference to it in some cost centers. But that doesn't mean that a percentile approach must be adopted by the state across the board. Whether where it is used by the state in a specific cost center, whether it's adequate within the Boren Amendment as to a specific cost center, and whether it's followed there is a separate question from this issue.

Now, there was also the argument made that the *McNutt* Washington case required the state to follow percentile approach, and in particular a 93 percentile standard.

The *McNutt* case does not stand for that proposition. The trial court used that approach and made a finding in regard to the 93rd percentile, but the appellate court indicated that they expressed no opinion on that part of the trial court's decision. That was not the subject of the appeal. The *McNutt* case had to do with years prior to the case we're dealing with here and prior to the Boren Amendment, as I understand it. In that case the trial court adopted a program under a different law that is simply not relevant here, and the appellate courts made no conclusion that would be binding on the state in the years after that case.

The bottom line on issue two is also that the plaintiffs have not made out a prima facie case on those issues and they should therefore go no further.

The third issue is labeled in paragraph 2(f) of the pretrial order, "Whether the Boren Amendment requires a state to set rates that include a reasonable return on investment in addition to meeting the costs that must be incurred by efficiently and economically operated facilities." At the

risk of going a little bit beyond that question, I want to make some comments about the return on investment program.

First, the Boren Amendment does not require a return on investments or a return on equity or a profit allowance to the providers. Now, the state does, in its plan and by statute. So while that's not part of the Boren Amendment, that is part of the state plan. But I think we need to note that everything that the state pays to nursing homes goes into the Boren satisfaction issue. I think those things are not separable by cost center or otherwise. What I am saying is that even if the state should be shorting providers in some particular cost center, the bottom line on satisfaction of the Boren Amendment is whether the total rate is sufficient under the Boren Amendment, and that means that for purposes of Boren analysis, profit, whether you call it profit, return on investments, return on equity or something else, can be offset, if you will, against other cost center shortages.

Now, that's in regard to satisfaction of the Boren Amendment. It may be different in regard to the application of specific state rules or law.

I was concerned about whether what I have just said really follows from the overall set-up here, the overall program, and I'm satisfied that I am right in that regard. All cost center rates go into one big umbrella rate, if you will—that's one way to put it—and it is the big umbrella rate that we are dealing with in the question of whether the rates meet the Boren Amendment.

I would refer specifically—Where's the statute?—to RCW 74.46.530, paragraph (1)(e)(iii), which is consistent with that interpretation. I would also refer to the state plans. For example, Exhibit 13, at page 5, under "Rate Setting," Section b, which refers to the rate being made up of five component rates and profit area or return on equity.

The point in citing those is just to give you examples of parts of the plans and law that leads me to the conclusion that in the

Boren test the bottom line is the appropriate one which includes all of the sources of rates. It's not a question of whether one particular cost center is met or meets the Boren Amendment, but rather whether altogether they meet the requirements of the Boren Amendment.

Again, I would repeat, that's a little different question than what may be required under state law. It may be the same, but it is a little different.

The fourth—I think we're up to the fourth—oh, in regard to the issue labeled in pretrial order as 2(f), again, the plaintiff has failed to make out a prima facie case on that particular issue and it should go no further.

In regard to the next issue, which is labeled paragraph 4 of the pretrial order, it is whether the defendants' assurances to HCFA comply with the requirements of the Boren Amendment and are supported by the findings required by the Boren Amendment. I'm going to come back to that, because that's the most complicated issue.

Let me move on to the issue labeled in paragraph 9 in the pretrial order, and in that issue, again, there are two separate statements of the issue, but the issue surrounds the supplemental wage allowance and reporting process.

To make a long story short on this issue, I also agree with the defendants on this issue. The state just simply did not do anything wrong in the way they handled this question of supplemental wage allowances. They got information. The information was not satisfactory to them. They felt it was not appropriate to act on, so they acted on the information they had and invited the providers to submit supplemental information. Some 200, more or less, of them did so and got the supplemental wage allowance. Some 78, more or less, did not do so and therefore did not get that allowance. There is no indication that that 78 in some way were treated unfairly or that they didn't get the word or that they had a right to that allowance and because of some procedural problem didn't get that money. There is no indication that among them there were some that had a right to

that allowance. In fact, so far as we know from the record, they didn't ask for that through the appeal process because they weren't entitled to it.

I looked at some things in connection with this issue, also, that lead me to the conclusion that the burden is on—I think it is clear anyway, but I looked it up—but the burden is on the providers to provide the information that the state needs to determine their rates. The statutes, 74.46— well, part (a) on reporting indicates that. Section 457 refers to incorrect or incomplete reports; 770 gives program of relief from the process, if my note is correct here.

Another example is in Exhibit 113, under Section 11, Reports. Those statutes don't directly apply to this wage allowance reporting system—or that exhibit—but they clearly set out that the burden is on the nursing homes to provide the information that the state needs. That's the process that they go through, and the providers simply are not entitled to something unless they provide the needed information in order to get it. There simply, in my judgment, was nothing wrong in the way the state handled that issue, and the defendants are also entitled to prevail on the issue labeled paragraph 9(a) and (b).

The next issue was in paragraph 10 of the pretrial order, whether the index of cost increase used by defendants to limit nursing services cost center reimbursement complies with the statute. Well, again I agree with the state on this issue. It is a reasonable interpretation for the department to make, that they were to find an existing index rather than to create an index. The medical component of the Consumer Price Index is the index of presumption, if you will, and it is appropriate that they use that. They tried to find another one that was better. The plaintiffs objected to the one they found, and they chose not to follow through with it. That left them with what the statute left them with, the Consumer Price Index figure.

Now, the plaintiffs make a real good argument here for a change in the law, but

the defendant department has complied with the law as it is written now. I would note also that that index requirement is in 74.46.481, subsection 5. In subsection 10, as we discussed, there is relief for the providers in regard to quantity of nursing services. That still leaves the hiatus in regard to increased quality of nursing services, arguably, that is not covered in the statute, and maybe it should be. But there is no legal requirement that that be covered, other than the way it is covered now in the statutes, and certainly, the state was under no obligation to create an index different than what the statute required.

Now, that still leaves in this subject, of course, the ultimate question of whether under the Boren Amendment the total rates comply with the law, and that's a different issue. But again, the plaintiffs have not made out a case in regard to pretrial order issue number 10, and that should go no further.

The last one listed, but not the last I will discuss, was listed in pretrial order paragraph number 16, whether the defendants have violated their Medicaid contracts with the plaintiffs by failing to pay in accordance with federal and state law.

Now, as I indicated, my first feeling about this was that this contract issue would be moot, depending on the result of the rest of the case. If the Boren Amendment and state law requirements are met, my initial assumption was, then the contracts have been met. If the Boren Amendment and the state law requirements have not been met, then the contracts have not been met. It was argued briefly the other day that at least one of the two contracts filed as exhibits indicate that the state has an obligation to pay something other than what is required by the Boren Amendment. That is, actual allowable costs. So I tried to examine those exhibits, 112 and 113, which are examples of contracts that providers have entered into with the state, and also Exhibit 96, which is the manual for accounting and reporting and excerpts from different manuals, I might say, but they are all manuals for accounting and reporting.

The bottom line on this issue is that this is not a contract case, except as I originally thought it was. I think those contracts and the manual, when you read them altogether, lead to the conclusion that the state's obligation is, under the terms of the contracts, to pay in accord with the Boren Amendment and state law. If they don't, they violate the contracts and violate the law, and if they do, then they don't violate their contracts or the law.

First, those manuals are for accounting and reporting. They do not purport to fix rates, but only are manuals for accounting and reporting, which leads to rates. You have to read these contracts, of course, with all of the other documents, including statutes and regulations, both state and federal, in order to get the full meaning of them.

I would just call to your attention that in Exhibit 112, which is the earliest sample contract, the agreement to pay was to pay in accordance with "clause 2 above." "Clause 2 above" refers to the nursing home manual for accounting and reporting, so the payments have to be in accord with that manual, but that doesn't say that the amount is fixed by that manual. They're to pay "such amount determined to be allowable and allocable by the department under the provisions of the cost-reimbursement portion of the manual previously incorporated."

When you say not only allowable, but allocable, that means the amount fixed by the department in the rate setting process. The amount allocated by the department.

There is a further proviso in this contract, "that nothing herein shall be construed as giving precedence to provisions of this contract over any provisions of law," which adds support, I think, to my conclusion that the intent of that language is to pay in accord with the rate setting procedure required by law, state and federal, as part of the reimbursement process and the rate setting process.

So I think, in other words, that what that says, when it is boiled down to its real terms is that the agreement is to pay in accord with state law and federal law.

The second contract, No. 113, refers in section 13 more specifically to the same requirement. "The Department shall pay for such services only as authorized by laws and regulations of the State of Washington and the United States, as now existing or hereafter adopted or amended, relating to payment for Medicaid services, including but not limited to" a number of statutes and administrative code regulations cited.

What I am saying, I guess, is that my interpretation of 112 is that it in fact means the same as 113, and the bottom line is that the state has agreed with these providers to pay in accord with state and federal law, and if they have done so, they're not in violation of their contract. If they have not done so, they are in violation of the contracts, but they have a legal obligation to pay at that rate, and so it doesn't matter whether it's a contract claim or purely legal claim.

That's my analysis of that issue. The result is that that issue should not now be dismissed from consideration in this case, but it should go forward for consideration, but only on a parallel track with the issue of payment in accord with law.

Now, that gets me back to paragraph 4 of the pretrial order, which is the most complex of these various issues; that is, whether defendants' assurances to HCFA comply with the requirements of the Boren Amendment and are supported by the findings required by the Boren Amendment.

Let me review my notes before I start talking here. It might make more sense if I do this first.

I was telling these people that were in here the other day that were working on the design guide for federal court—there's a national guide they are working up—that one thing a judge needed was more space than what I have here. This is a long desk, but it's narrow, and I don't have the space I need.

Let me first talk just for a minute about the various cases cited on this issue. I'm

going to talk about a couple of them briefly. I shouldn't say "briefly" because you won't believe me and I won't do it. I want to talk about a couple of them, but let me kind of characterize these cases generally that have been cited and argued and that I have been reading over the weekend:

First, a lot of them are pre-Boren Amendment cases that on that basis alone are of little help to us. Many of them are just simply not helpful on the facts. The facts are too different from our case to be of much help. In that regard, many of the cases are attacks on plans where the plans are a lot different from this state plan, and so they're not particularly helpful. Others are rate attacks, on rates set differently than the way they are set here, that aren't particularly helpful. None of the cases that I saw are sufficiently close on the facts to this case to adopt the reasoning of another case in total. However, some of them have been very helpful in trying to analyze this issue of the sufficiency of the findings and assurances.

Let me jump ahead and say that I am satisfied that the state findings and assurances are sufficient and do satisfy the Boren Amendment. Let me talk about why I came to that conclusion in connection with some of these cases, and some other ideas, I guess, that the evidence has led me to without the assistance of counsel, perhaps.

Some of the cases, and in particular *California v. Schweiker*, argued that the state process was an attempt to make out the best case to support the state's position. That their findings, in other words, were an attempt to find "how do we support a position?" rather than as a basis to find the right position. That clearly is not the way it is supposed to be done, but the evidence here does not support the argument that it was done by the state; that the state's process in adopting the plan-making findings and assurances was based on trying to justify a result.

In regard to the *Pinnacle* case, which sets out in an appropriate way, I think, a comparison of the requirements for assurances, and the assurances actually made by the state of New York, in a side-by-side fashion, even though the facts are a lot different in that case, is an argument for that approach. I have try tried to do that, although I haven't done it in the formal way that the judge did in that case in terms of writing it up and setting it out. But the judge there said that "The State's assurances are best evaluated in a direct comparison with the Federal regulation which mandates their submission."

That's a common sense statement and appropriate. So I tried to do that, and I found that in many instances, the assurances parrot the language of the federal requirements. There's nothing inherently wrong with that because that's what the federal government asked the state to give them assurances on. So any self-respecting bureaucrat—if you will excuse the term—is going to want to not change the language around too much because they want to be sure that the federal government knows that they are giving them the direct and specific assurances that the federal government requests. But the question is, I guess, is that all that was done? Mr. Grimm pointed out in argument, or argued, that it was what was not done there that was important.

Well, those assurances in the various exhibits that set out the state plans are fleshed out very substantially. Many of the findings are included—it's like lawyers have trouble trying to figure out what's a finding of fact and what's a conclusion of law. The same thing is true here in trying to determine what's a finding and what is an assurance. The findings don't have to be in here, but many findings are, and the assurances go beyond the minimum required by the federal government.

The bottom line on that comparison, I guess, comes down to what the judge said in that case. I shouldn't just refer to him as some unnamed judge. It was Judge Telesca. He said in the *Pinnacle* case: "I find that no reasonable person could consider that these 'assurances' even address, let alone answer, either the general requirements of the federal regulation or the specific concerns raised by HCFA. The

assurances are patently and painfully insufficient, constituting nothing more than a formalistic recitation of the federally mandated requirements of a Medicaid Plan."

That is simply not the fact in this case, nor is it my conclusion. My conclusion is the opposite, that these assurances do address and answer the general requirements of the federal regulations and they are sufficient and they are far more than a formal recitation of the federally mandated requirements of the plan. That's based on a comparison of the requirements and the plan, as Judge Telesca did in that case.

Now, the other case I want to spend some time with, that I think is a very important case, is the *Amisub* case. This comes out of a different circuit and is an attack on a state plan. It's a very different plan than what we are dealing with here. But there's some good law in the *Amisub* case that gives me a lot of guidance.

First, the standards for review—that we have set out on the board here and that we have discussed—are well stated in that case and obviously require that the court determine whether the state plan is procedurally and substantively in compliance with requirements of the Medicaid Act, and so it goes beyond that. But the interesting thing there is the fact that in examining any law, or any plan or state action or whatever, we look at both procedure and substance. Those two things go hand in hand throughout the law because you can have a good law that doesn't have due process built into it and it can fail, or vice versa.

So those standards for review were helpful, and I think we have already analyzed that review standard enough.

In that case, after discussing the standards for review, they proceeded to findings regarding another type of a plan, and it was findings in regard to that plan that came under attack in the *Amisub* case. In trying to determine whether that plan was adequate and whether the findings and assurances were adequate to support it, the court said some interesting things. The thing that we have dealt with most is the language of that court on page 796 of the published opinion, where the court said: "The plain language of federal Medicaid law mandates the State Medicaid Agency, at a minimum, to make 'findings' which identify and determine efficiently and economically operated hospitals"—that's number one. "(2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals."

What the state is to do as part of its finding process—and remember that findings don't necessarily have to be written down as part of the plan—but they must make findings to support those assurances which identify and determine those things. That doesn't say they have to define those things. They have to identify and determine those things.

It's interesting that, in that case, it is clear from another statement, at page 799, that the question in regard to those findings was an issue for trial. In other words—well, to repeat what the court said at page 799, "Perhaps 'assurances' are adequate for HCFA, but at trial a party must offer evidence, which supports its position." The point of that is that this trial, I guess, is the last chance, but can be the first chance for the state to offer the evidence that supports its findings.

Now, in that case, after making those kinds of statements and referring to the plain language of the federal law, which basically is the language of the Boren Amendment—which if it was plain, we probably wouldn't be struggling with so much—but after making those statements, the court then resolved that case on the basis of the evidence presented. They said the "evidence at trial was flagrantly devoid of any effort to make the federally required findings." That's at 796. At 799, they indicated the requirement that evidence be produced, and at page 800 they indicated that the basis for the findings were only budgetary constraints. Clearly, the evidence in that case was not sufficient to support the plan. So, in other words,

the result of the case was based on something we don't have here; that is, a lack of evidence. We have much more evidence in this case supporting the plan.

But the other thing that the *Amisub* case did that is helpful to me as it went through that process is to refer to some things that the court should be considering. One, at page 797, there is a presumption that the state will engage in a bona fide finding process before it makes assurances to HCFA that the required findings have been made. That goes back to the burden of proof that is on the plaintiff here rather than on the defendant.

They referred at page 799 to the requirement that there be evidence available and offered to support its findings.

The court indicated that "the court must determine whether the agency action was based upon 'a consideration of the relevant factors and whether there has been a clear error of judgment.' "

The court said, also at page 800, "our task is to determine if there was a reasonable factual basis to support the State Medical Agency's findings and assurances . . ." So similarly, I must look for a reasonable factual basis.

They indicated clearly that budgetary factors alone do not translate to automatic compliance with the federal requirements; and further, that a "state must articulate a 'rational connection between the facts found and the choice made.' " I think that is a sensible statement and good law.

The agency must consider " 'the relevant factors and data so that a rational relationship exist[ed] between' the facts considered and the resulting findings."

What all that says—it gives guidance to me in how I should approach this analysis, but part of what it says is that I should not substitute my ideas on this issue for the state's, if the state has done what it should do in analyzing the evidence it has, in coming to findings and conclusions. If the state does it right and finds a rational connection in relationship, etc., it is not up to me to substitute my judgment.

So, anyway, I guess that's the end of the things I wanted to say about the *Amisub* case. I think it is a very helpful case, but I think it is not a direct help, but rather general help in terms of how to analyze the issues presented.

Now, a couple of other things about this issue that I think need to be said. One is that there was no challenge here—or at least no successful challenge—to the testimony of the witnesses Mr. Wills and Ms. Marshall and Ms. Gaither as to how the plan was adopted and what evidence there was that supported the findings that supported the assurances. I found them to be credible and believable witnesses at this stage of the game, and the way that the state operated is the way that they indicated it operated, apparently.

Clearly, some of what they did in making findings and assurances was based on informal analysis rather than formal analysis. Surely, they didn't write up every finding with all the evidence that supported that finding each year. That would have been very helpful to the court, when you come to court review, but it is not required by any law that I know of.

The other thing that I want to say about this—well, let me take what I just said one step further. I don't know if I have a specific reference to this or not here, but they indicated that they kept track of survey problems regarding quality of health care and they kept track of who was coming in and going out of the system through the certificate of need process, and were aware of sales of nursing homes and the like. That was done on an informal in-house basis because the people involved with setting rates were nearby to these other people and could get that kind of information, both on an informal and on a formal basis, if they needed it, but mostly that was general information available in the office as shared information between staff people. They used that information to come to some fact findings that appear, not in exactly the same way in all plans, but appear in the plans—that from the rates that they are providing, they expect that the quality of care will not go down

and that it will not adversely affect the nursing home economy.

Those general findings are based on the informal gathering of information. There's no successful attack made on the information that they cited or referred to. It may be subject to interpretation, but there is no indication that their interpretation of that information was unreasonable. It seems to me that in that small part of the finding and assurance process, even though it perhaps is marked by the least formality, there's just—I just see nothing wrong with that. It was part of the overall picture, and they included that. It satisfied the federal government people, and it also satisfies this court. They analyzed all kinds of information in coming to the decisions they came to, and that information—much of which we have here in court, and a lot of it we have referred to in court through testimony—appears to be ample to support the findings, and the findings are ample to support the assurances that the state made.

Now, let me take this whole thing one step further; and I have marked some exhibits here I want to refer to.

I invited counsel to jump on this bandwagon to some extent and wasn't taken up on it. But it seemed to me as we went through this, and it still seems to me, that the identification of efficiently and economically operated facilities is closely tied up to and is part of the rate setting process. It's not two separate things; it's done together in this state. Individual rates are set, and they are set—well, we know how they are set, I don't have to go through all that. But the rate that comes out at the end is based on an analysis of what rate is required to pay an efficiently and economically operated nursing home at that particular level. To say that it's a separate process, it seems to me—the evidence doesn't support that. It's all part of the same process.

I don't think there's anything wrong with that in reaching compliance with the Boren Amendment. Lawyers and judges are always trying to parse things out into little parcels and little findings here and findings there and all that stuff. Well, people don't

really work that way, and the state has not worked that way in this process. The important thing in what they do is the bottom line. As part of this rate setting process, they have kept their eye on the efficiently and economically operated facility requirement of the Boren Amendment and that has been part of their analysis in the way they set rates. I think you cannot totally separate those two processes, and I don't think you should be required to.

What I marked that kind of, I think, supports my approach to this is Exhibit 13—the '81–'82 plan, I guess it is—approved in January of '82. On page 9 they are talking about rate setting. It's a long section regarding rate setting. At the top of the page, it says this: "Rates will be set which are no lower than the level which the department reasonably expects to be adequate to reimburse in full the actual, allowable costs of a facility which is economically and efficiently operated and provides service in compliance with applicable federal and state standards."

Then lower on that same page it says, "Payment rates are set for each individual facility."

What that says to me is that the rate setting process is part of the identification of what's efficient and what's an efficient and economically operated nursing home. So that's one place that I think specific language supports my conclusion.

Exhibit 18, I had the letter, page 2, marked. That was a part of the assurances. The first part is simply basically a repeat of the requirement, but the last part, they indicate, "Based upon preliminary and final settlements for prior years utilizing both audited and unaudited reported costs, the department has found, pursuant," to the regulation, "that the rates employed are sufficient to meet these standards."

The point is that the standards of efficient and economic operation and the standards of the rates are inextricably bound together, it appears to me, and that's the approach that the state has taken. Rather than saying this is an efficiently and economically operated nursing home and so

we're going to pay the costs or pay this rate, they determine the rate and the definition of each individual nursing home individually and at the same time. I don't see anything wrong with that.

Also in that same letter, I noted at page 3 the expectation finding regarding the rates to be paid not affecting care or provider participation that I referred to earlier.

It seems to me, using that approach, that the state has made, in its rate setting process and in its whole program, findings which identify and determine efficiently and economically operated hospitals, the costs that must be incurred by those hospitals, and payment rates which are reasonable and adequate to meet the reasonable costs of those efficiently and economically operated hospitals. That's what they did, just as that is required in the *Amisub* case, even though they didn't do it in three separate distinct steps. They did it altogether. I don't think there is anything wrong with that under the Boren Amendment. So the defendants should also prevail on that issue.

Now, that doesn't answer all the questions in this case, and I understand I have narrowed the issues substantially.

I guess what I have done is say that there is nothing inherently or legally wrong with the state plan. That still leaves the question, the basic question, of whether the reimbursement rates paid by the state to the providers are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities as required by the Boren Amendment. We have many questions raised by the plaintiffs' evidence that put that rate issue in question, and what I want to point out is that you can have a plan that is not inherently wrong or in violation of law, the findings and assurances can be adequate, but nevertheless, the bottom line rates may not comply with the Boren Amendment. We still have that question.

What my finding or order this morning does, basically, is convert this case from a plan and rate attack to a rate attack only. It is that issue—that is, whether the rates as in fact paid by the state comply with the Boren Amendment and with state law—is the question that remains and that we should now concentrate on.

The defendants' motions will be granted, with the exception of the motion that attacks the issue identified in paragraph 16 of the pretrial order relative to contracts.

Now, let's take a break while you and I recover from that, and we will reconvene at—Well, are you ready to proceed, Mr. Lynch?

MR. LYNCH: Ready.

THE COURT: We will reconvene at ten minutes to 11:00.

(Recessed.)

### CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Juliane V. Ryen
JULAINE V. RYEN

December 6, 1989
    Date